**Carrie QUATTLEBAUM,
et al., Appellants,**

**v.**

**Sharon Pratt KELLY, Mayor of
the District of Columbia, et
al., Appellees.**

**No. 92–CV–504.**

District of Columbia Court of Appeals.

Argued May 26, 1993.
Decided Oct. 20, 1994.

Anthony Herman, with whom Joshua D. Sarnoff, Eric Lasker, and Florence Wagman Roisman, Washington, DC, were on the brief, for appellants.

Karen L. McDonald, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, were on the brief, for appellees.

ownership to preclude a directed verdict on that ground.

Kathryn W. Lovill, with whom Walter A. Smith, Jr. and A. Lee Bentley, III, Washington, DC, filed a brief on behalf of the Children's Defense Fund, as amicus curiae.

Before FERREN and SULLIVAN, Associate Judges, and PRYOR, Senior Judge.

SULLIVAN, Associate Judge:

This is an appeal from the trial court's order denying appellants' motion for summary judgment and granting appellees' motion for summary judgment. Appellants' principal contention on appeal in this class action lawsuit [1] for declaratory, injunctive, and monetary relief is that appellees, the District of Columbia and its highest-ranking officials,[2] improperly enacted emergency legislation [3] effective July 1, 1991, reducing, to October 1, 1989 levels, recipients' entitlement to benefits under Aid to Families with Dependent Children ("AFDC").[4]

The three issues raised on appeal are: (1) whether the District's failure to reassess the current minimum needs of its AFDC recipients, prior to enacting the benefit reductions contained in the 1991 Act, constituted a violation of D.C.Code § 3–205.44(b) (1988); (2) whether the District's express recognition that the AFDC benefit reduction would be partially offset by correlative increases in food stamp benefits violated 7 U.S.C. § 2017(b) (1988); and (3) whether the District's notice advising AFDC recipients of the benefit reductions, which failed to provide individual computations of new benefit levels and failed to indicate the circumstances under which individuals affected by the cuts could obtain a hearing on computational grounds, violated D.C.Code § 3–205.55(c) (1988), 45 C.F.R. § 205.10(a)(4)(iii) (1992), and the Due Process Clause of the Fifth Amendment to the Constitution.

We find persuasive the second and third arguments raised on appeal.[5] Accordingly,

1. Appellants Carrie Quattlebaum, Marina Ferrufino, and Rachelle Bobo pursue this appeal on behalf of themselves and the certified class of more than 56,000 AFDC recipients in the District of Columbia—including more than 40,000 children—whose benefits were reduced by legislation. Appellants are representative members of the class which was certified by the trial court's order of September 18, 1991, as including all persons who are, or would be, eligible to be recipients of AFDC in the District of Columbia under the standard effective on June 30, 1991.

2. In addition to Sharon Pratt Kelly, in her official capacity as Mayor of the District of Columbia, appellees include: the late John A. Wilson, in his official capacity as Chairman of the Council of the District of Columbia at the time this appeal was filed; H.R. Crawford, in his official capacity as Chairman, Committee on Human Services, Council of the District of Columbia; Vincent Gray, in his official capacity as Director, Department of Human Services, District of Columbia; and the District of Columbia as a governmental entity.

3. See 38 D.C.Reg. 3390 (May 17, 1991), The Omnibus Budget Support Emergency Act of 1991; and The Public Assistance Act of 1982 Budget Conformity Amendment Act of 1991, D.C.Law 9–27 (August 17, 1991). The Omnibus Budget Support Emergency Act reduced benefits to the District's AFDC recipients, and the Public Assistance Act of 1982 Budget Conformity Amendment Act made permanent the substantive provisions of the former (hereinafter the two acts will be referred to collectively as "the 1991 Act").

4. 42 U.S.C. §§ 601–687 (1988) is a joint federal-state cost-sharing program which was originally enacted by Congress as part of the Social Security Act of 1935. Under AFDC, financially needy households which include dependent children receive monetary payments that are funded jointly by the federal government and participating states, including the District of Columbia.

Benefit levels are determined by a two-step process. First, each participating state establishes a standard of need, which is a dollar figure that the state considers adequate to provide for subsistence needs—i.e., food, clothing, and shelter. Second, each state determines the level of benefits, which is the amount of the standard of need that the state actually will pay to recipients.

The last time the Council altered the "standard of assistance," as the D.C.Code refers to the standard of need, was in 1986, when it set the present standard based on the 1985 cost-of-living index. See D.C.Code § 3–205.52 (1988 and 1992 Supp.).

5. As to the first argument, appellants maintain that appellees failed to reassess the current minimum needs of AFDC recipients prior to enacting the AFDC benefit reductions contained in the 1991 Act and, thereby, violated D.C.Code § 3–205.44. The trial court found that the supporting evidence submitted by appellants, which has not been challenged by appellees, demonstrates that only twenty-five minutes of the thirty-six hours of hearings, meetings, and debates leading up to passage of the 1991 Act touched on AFDC benefits. Moreover, we note that the uncontroverted evidence submitted by appellants shows

we reverse the orders of the trial court denying summary judgment in favor of appellants and granting summary judgment in favor of appellees and remand the case to the trial court for further proceedings consistent with this opinion.

## I.

### *Facts*

On March 1, 1991, during a fiscal crisis, the Mayor submitted to the Council of the District of Columbia ("Council") her revised Fiscal Year 1991 and her Fiscal Year 1992 budget proposals. The cumulative effect of the Mayor's budget proposals would be to permanently suspend the previously automatic annual AFDC cost-of-living adjustment ("COLA") and, further, to reduce individual AFDC recipients' entitlement to benefits by 4.5 percent across-the-board, rolling them back to 1989 levels.

On March 18 and 19, 1991, the proposed budget was introduced in the Council and referred to the Committee on Human Services ("the Committee"). In its deliberations, the Committee did not attempt to assess the minimum needs of AFDC recipients. Nonetheless, the Committee issued a REPORT OF THE COUNCIL OF THE DISTRICT OF COLUMBIA COMMITTEE ON HUMAN SERVICES ON BILL 9–159, PUBLIC ASSISTANCE ACT OF 1982 BUDGET CONFORMITY AMENDMENT ACT OF 1991 (Apr. 25, 1985), D.C.Law 9–27, signed by Chairman H.R. Crawford (hereinafter "Crawford Committee Report"), which recommended that the Council adopt the Mayor's revised Fiscal Year 1991 and her Fiscal Year 1992 budget proposals as amended. The Committee's proposed budget legislation, the AFDC portion of which was ultimately adopted by the full Council, amended the Mayor's proposal,

*inter alia,* by suspending the automatic annual COLA provision until October 1, 1993. The budget legislation did not totally repeal the COLA provision or leave the determination for allowing the COLA up to the Mayor to effectuate by rulemaking authority. *See* Crawford Committee Report at 6. The "Background and Need" section of the Crawford Committee Report stated with regard to the proposed reduction in AFDC benefits that the 1991 Act would "suspend the automatic consumer price indexing of public assistance payments to recipients of the AFDC ... program[ ] until 1993" and "reduce the level of payments to all recipients of public assistance programs [including AFDC], beginning July 1, 1991, to the payment level used on October 1, 1989[.]" Crawford Committee Report at 3.

In the same section, the Crawford Committee Report noted that "the loss of [AFDC] benefits will be offset by an increase in the monthly [f]ood [s]tamps allotment for which individuals and families are eligible." That is to say, under federal law, food stamp allotments automatically increase as an eligible recipient's income (from AFDC funds or otherwise) goes down.[6] The Report presented the following chart as an example of "the impact [of the AFDC benefits reduction] by family size":

| Household | FY 90 | FY 91 | AFDC Decrease[7] | Food Stamp Increase |
|---|---|---|---|---|
| 1 | $ 258 | $ 270 | $ 12 | $ 4 |
| 2 | 321 | 336 | 15 | 5 |
| 3 | 409 | 428 | 19 | 6 |
| 4 | 499 | 522 | 23 | 7 |

Crawford Committee Report at 6. Also, during a meeting of the Committee held on April 25, 1991, to consider and mark up the proposed budget legislation and the Crawford

that no time whatsoever was spent discussing the current minimum needs of AFDC recipients and that the recommendations of the Rivlin Commission were not even acknowledged. Thus, we conclude that there is no genuine issue of material fact as to whether appellees assessed the current minimum needs of AFDC recipients in the District of Columbia prior to enacting the benefit reductions by passing the 1991 Act: they did not. In view of our disposition of this appeal on other grounds, however, we need not reach the issue of whether D.C.Code § 3–205.44 imposed a *requirement* on appellees to assess current minimum needs during the deliberations on the 1991 Act.

6. 7 U.S.C. § 2017(a) (1991) states in relevant part:
   The value of the allotment which State agencies shall be authorized to issue to any households certified as eligible to participate in the food stamp program shall be equal to the cost to such households of the thrifty food plan reduced by an amount equal to 30 per centum of the household's income....

7. This column represents the amount of prospective reduction in benefits as a result of the Council's legislation and is not intended to reflect, as might be interpreted, any FY 91 *increase* over FY 90 benefits.

Committee Report, the following colloquy occurred:

> Councilmember Rolark noted that these types of reductions were devastating, because they "hit the most vulnerable of our population, the poor." ... Chairman Crawford responded ... that some of the difference in the public assistance reductions would be off-set in the allocation of [f]ood [s]tamps....
>
> Councilmember Rolark ... commended the chairman for having worked hard to off-set the reductions.

Crawford Committee Report at 17.

The affidavit submitted by appellants, and uncontroverted by appellees, shows that during the two months following the Mayor's initial presentation of her budget proposal, the Council held approximately thirty-six hours of public hearings, meetings, and debates on the proposed budget. Only about twenty-five minutes of those events were devoted to consideration of AFDC benefit levels, and literally no attention was paid to the current minimum needs of AFDC recipients in the District.

Moreover, at the time the Council was deliberating, numerous reports and analyses based largely on official government sources and prepared by such organizations as the Children's Defense Fund, *amicus curiae* in this case, were available documenting the problems and minimum needs of poor families in the District, and illustrating the effects of poverty on District children.[8] In fact, just six months earlier, in November 1990, the Commission on Budget and Financial Priorities of the District of Columbia[9] issued a report[10] which assessed the needs of the District's poor in the context of considering budget priorities. The Rivlin Commission Report expressed grave concern that the then-current AFDC benefit level already presented a "hardship for District recipients," Rivlin Commission Report at 3–20, because the level was only fifty percent of the federal poverty level, and recommended that there be no AFDC benefits reduction.[11] *See id.* Neither the Crawford Committee nor the Council noted any of these reports.

On May 7, 1991, the Council enacted, and on May 17, 1991, the Mayor signed the 1991 Act. As the trial court's Memorandum Opinion states:

> The [1991] Act did not alter the standards of assistance, [set forth in D.C.Code § 3–205.44 (1988) ] but reduced payment levels to those in effect prior to a cost-of-living increase which took effect on October 1, 1990. Thus, the net effect was to reduce payments to 1989 levels. In addition, the Act suspended the automatic cost-of-living increase implemented by the Council in 1986. The cost-of-living increase is scheduled to resume in 1993.[12]

*Quattlebaum v. Dixon,* 120 Daily Wash. L.Rptr.1925, 1929 n. 7 (D.C.Super.Ct. September 9, 1992).

On June 15, 1991, the District mailed a standard notice, in English, to AFDC recipients, which stated as follows:

8. *See, e.g.,* CHILDREN'S DEFENSE FUND, CHILD POVERTY: COMPARATIVE NATIONWIDE AND STATE DATA FROM THE 1990 AND 1980 CENSUSES (1992); CHILDREN'S DEFENSE FUND, 1991 CHILD POVERTY DATA RELEASED BY CENSUS BUREAU (1992); CHILDREN'S DEFENSE FUND, BRIGHT FUTURES OR BROKEN DREAMS: THE STATUS OF THE CHILDREN OF THE DISTRICT OF COLUMBIA AND AN INVESTMENT AGENDA FOR THE 1990s (1991); CHILDREN'S DEFENSE FUND, CHILD POVERTY IN AMERICA (1991); CHILDREN'S DEFENSE FUND, THE STATE OF AMERICA'S CHILDREN: 1991 (1991).

9. The Commission on Budget and Financial Priorities of the District of Columbia ("Rivlin Commission") was a blue-ribbon panel established specifically to develop strategies for resolving the District's fiscal difficulties.

10. COMMISSION ON BUDGET AND FINANCIAL PRIORITIES OF THE DISTRICT OF COLUMBIA, FINANCING THE NATION'S CAPITAL: THE REPORT OF THE COMMISSION ON BUDGET AND FINANCIAL PRIORITIES OF THE DISTRICT OF COLUMBIA (November 1990) (hereinafter "Rivlin Commission Report").

11. The Commission also found it imperative that the District continue to provide "[h]uman services programs to help low-income residents achieve self-sufficiency and meet their health, housing, and employment needs," as well· as "[e]ducation and health programs to provide children with a brighter future." Rivlin Commission Report at vii.

12. The 1991 Act also had the effect of terminating AFDC eligibility for some members of the class and, correspondingly, terminated their categorical eligibility for Medicaid.

Dear Recipient:

Effective July 1, 1991, your public assistance check will be reduced by the cost of living increase which was approved on October 1, 1990. Your check will continue to be based on your family size and any countable income you may have. For example, if your family size is 3 and you have no income, your July check will be $409 instead of the $428 you received for June. A few of you who have countable income which exceeds the payment level effective July 1, 1991, may not be eligible to continue receiving a check.

Since this reduction is the result of D.C. Act 9–37, if you appeal, your benefits will not be increased.

## II.

### Standard of Review

■ This court reviews a ruling of the trial court granting summary judgment *de novo*, including " 'an independent review of the record.' " *Byrd v. Allstate Ins. Co.*, 622 A.2d 691, 693 (D.C.1993) (quoting *Smith v. Union Labor Life Ins. Co.*, 620 A.2d 265, 267 (D.C.1993) (citations omitted)). The standard of review on appeal is identical to the trial court's standard: we will affirm the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Super.Ct.Civ.R. 56(c). *See also Byrd, supra,* 622 A.2d at 693 (citing *Holland v. Hannan,* 456 A.2d 807, 814 (D.C. 1983)).

## III.

### A. Increase in Food Stamp Allotments as a Partial Offset for the Reduced AFDC Benefits

■ Appellants argue that appellees improperly took food stamps into account in reducing AFDC benefits, thereby violating 7 U.S.C. § 2017(b) (1991).[13] Appellants point

to the Crawford Committee Report, the only documentary legislative history of the 1991 Act, as corroboration of the Council's reliance on increased food stamp allotments. In recommending the AFDC benefit cuts to the full Council, the Crawford Committee Report stated: "[T]he loss of [AFDC] benefits will be offset by an increase in the monthly food stamp allotment for which individuals and families are eligible." That statement was accompanied by a chart, which drew a direct comparison between the "AFDC decrease" and the offsetting "Food Stamp Increase." See pages 952–953, *supra.* Appellants also note that the only reported debate over the impact on recipients of proposed AFDC cuts, which involved Council members Crawford and Rolark, focused exclusively on the fact that increases in food stamps would offset a portion of the benefit cuts. See pages 952–953, *supra.*

The trial court recognized that the legislative history cited by appellants was used by the Council "[to] call[ ] attention to the fact that increased food stamp allotments would offset approximately one-third of the AFDC decrease." *Quattlebaum, supra,* 120 Daily Wash.L.Rptr. at 1929. In addition, appellees conceded in oral argument before this court that the Council recognized that "under the Food Stamp Act, as income goes down [for AFDC recipients], food stamps go up." We conclude, therefore, that there is no genuine issue of material fact as to whether the increase in food stamp benefits, which, pursuant to. federal law, see note 6, *supra,* would automatically accompany appellees' reduction in AFDC benefits, played a role in the deliberations leading up to the 1991 Act: it did.

We must still determine, from a legal point of view, however, the nature of the causal relationship prohibited by 7 U.S.C. § 2017(b), before we can decide whether appellees violated that federal statute. 7 U.S.C. § 2017(b) provides, in relevant part, that "no participating State or political subdivision thereof shall decrease any assistance other-

---

**13.** 7 U.S.C. § 2017(b) states:

The value of the allotment provided any eligible household shall not be considered income or resources for any purpose under any Federal, State, or local laws, including, but not limited to, laws relating to taxation, welfare, and

public assistance programs, and *no participating State or political subdivision thereof shall decrease any assistance otherwise provided* an individual or individuals *because of the receipt of an allotment* under this chapter.

(Emphasis added.)

wise provided an individual or individuals because of the receipt of an allotment under this chapter." See note 13, *supra.* The trial court confined its reading of "because of" in 7 U.S.C. § 2017(b) to a "principal factor" test. The court stated that "the principal factor precipitating ... [the] reduction in AFDC benefits and suspension of the cost-of-living adjustment was the District's financial crisis." The trial court added that:

> The legislative history demonstrates unequivocally that the "cause" of the reductions was the District's severe fiscal crisis, not the consideration of food stamp allotments. Consequently, the Court concludes that the reduction did not violate the second prohibition of 7 U.S.C. § 2017(b).

*Quattlebaum, supra,* 120 Daily Wash.L.Rptr. at 1929.

The trial court, rejecting an argument to the contrary by the appellees, ruled that "§ 2017(b) continues to prohibit the District, having elected *not* to treat food stamps as income, from decreas[ing] any assistance otherwise provided an individual or individuals because of the receipt of [food stamps]." *Id.* (internal quotation marks omitted).

Appellees had asserted that the language and legislative history of 42 U.S.C. § 602(a)(7)(c)(i) (1987), which was a 1981 amendment to 42 U.S.C. § 602 (1987), demonstrate Congress' intent to allow states to count food stamps as income. *See id.* at 1928. The trial court ruled that their contention, even if correct, was immaterial because the language of that provision relates only to what a state AFDC plan may consider. *See id.* The court noted that the District of Columbia plan, which was adopted in 1982 and which has remained unchanged in this respect through the present time, explicitly elected not to consider food stamps as income. *See id.* at 1928–29. The court concluded that "[t]he District thus still treats food stamp allotments in accordance with 7 U.S.C. § 2017(b) as it existed prior to the 1981 Amendment." *Id.* at 1929.

Appellees argue in their brief in support of the trial court's ruling that the legislative history cited by appellants "show[s] nothing more than that the Council knew that, under the federal food stamp program, food stamp benefits increase as the level of income decreases." They contend further that "this recognition cannot be transformed, as appellants attempt to do, into a causal relationship between the level of benefits and the receipt of food stamps." During oral argument before this court, appellees contended that:

> [T]he dollar amount by which AFDC recipients' checks were reduced is based on the COLA given to them in Fiscal Year 1990.... That's the dollar amount being challenged here. Since there is an exact correlation, there is no basis to invalidate it simply because the Council recognized the way the federal Food Stamp Act works.

Therefore, appellees urge us to conclude that, because there is a direct dollar correlation between the amount of the COLA appellants received in 1990 and the AFDC benefit decrease, rather than between the amount of the food stamp allotment increase and the AFDC benefit decrease, "[t]he legislative history demonstrates that there was no causal relationship between the receipt of food stamps and either the decision to reduce benefits or the amount by which benefits were reduced." [14]

We are not persuaded by either the trial court's reasoning or by appellees' arguments to this court with regard to the nature of the causal relationship prohibited by 7 U.S.C. § 2017. First, the trial court's reading of "because of" in 7 U.S.C. § 2017(b) defies the plain meaning of the language, which is not limited to the sole or even the principal cause. Courts generally have rejected such a restrictive reading of "because of" in a variety of statutory contexts. They have ruled instead that Congress intended for the language to have its plain, everyday meaning. *See, e.g., Montana v. First Federal Sav. & Loan Ass'n of Rochester,* 869 F.2d 100, 105 (2d Cir.1989) ("because of" language in the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 (1986), does not require

---

14. Appellees' counsel argued during oral argument that if this court believes this to be a close case, the "Council deserves a presumption of regularity." In our view, appellees' assertion is effectively rebutted by statements in the legislative history concerning the food stamp offset to the reduction in AFDC benefits. See pages 952–953, *supra.*

proof that age was the "only factor" but rather that age "ma[d]e a difference"); *United States v. Hill*, 676 F.Supp. 1158, 1180–81 (N.D.Fla.1987) (finding that damages under the False Claims Act were "because of" defendant's false statements even though those false statements were not the only or even the principal reason for the default); *Brunetti v. Wal–Mart Stores, Inc.*, 525 F.Supp. 1363, 1376 (E.D.Ark.1981) ("Retaliation need not be the sole or even the primary reason for a discharge; as long as it was a factor, a violation under Section 2000e–3(a) [of Title VII of the Civil Rights Act of 1964] has occurred.").

The trial court's narrow interpretation of "because of" also contravenes the legislative intent of 7 U.S.C. § 2017(b) as follows:

> The legislative history of the [Food Stamp] Act makes clear that the intent of Congress was not to provide a substitute for other forms of aid to low-income persons but to supplement that aid in order to improve their level of nutrition. . . . It is evident that if welfare assistance is reduced to *take into account* the value of food stamps received under the Act, the ultimate effect of the Act will be not to raise but merely to maintain pre-existing levels of nutrition and the purpose of the Act will be frustrated.

*Dupler v. City of Portland*, 421 F.Supp. 1314, 1318 (D.Me.1976) (emphasis added) (footnote omitted) (citing S.REP. No. 1124, 88th Cong., 2d Sess. (1964), *reprinted in* 1964 U.S.C.C.A.N. 3275). *See also Long v. City & County of San Francisco*, 78 Cal.App.3d 61, 144 Cal.Rptr. 64, 69 (Cal.Ct.App.1978) (citing *Dupler, supra* ). This broad statement of the original legislative intent has been endorsed repeatedly by Congress in amending 7 U.S.C. § 2017(b).[15] *See* H.R.REP. No. 464, 95th Cong., 1st Sess. 247 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1704, 1978, 2191 (Congress specifically endorsed *Dupler* and *Long* so as to make "crystal clear" the broad prohibition against reducing AFDC and other gen-

eral assistance benefits programs in anticipation of the automatic increase in food stamps); 137 Cong.Rec. S18327 (daily ed. Nov. 26, 1991) (statement of Sen. Leahy) (federal Food Stamp Program should not be used by states, including the District, as a substitute for local welfare payments).

■ The weight of authority supports the view that local and state governments are not allowed under 7 U.S.C. § 2017(b), even indirectly, to consider food stamp benefits in setting public assistance payment levels. *See Woods v. United States*, 724 F.2d 1444, 1447 (9th Cir.1984) (by "[taking] food stamps into account in computing the general assistance benefit package. . . . San Francisco clearly violated . . . the Food Stamp Act") (citation omitted); *Foster v. Center Township of La-Porte County*, 527 F.Supp. 377, 379 (N.D.Ind. 1981) (7 U.S.C. § 2017(b) prohibits states from "indirectly tak[ing] into account the [applicants'] receipt of food stamps"), *aff'd mem.*, 673 F.2d 1334 (7th Cir.1981); *Dupler, supra*, 421 F.Supp. at 1318 (states may not "take into account" food stamp allotments); *Long, supra*, 144 Cal.Rptr. at 68–70 (municipality cannot "set its relief standards by reference to food stamp availability"); *Gooderham v. Adult & Family Servs. Div. of State of Oregon*, 64 Or.App. 104, 667 P.2d 551, 558 (1983) ("it would thwart the purposes of the Food Stamp Act to interpret 7 U.S.C. § 2017(b) to permit the use of food stamp benefit levels to decrease [other] assistance . . .").

We agree with appellants that the *Woods* and *Long* cases are directly on point with the present case.[16] In those cases, as here, a city was faced with a budgetary dilemma. The San Francisco Board of Supervisors, like the Council in this case, attempted to alleviate the city's financial crisis, in part, by setting welfare benefits below need and justifying that action on the basis that federal food stamp allotments would alleviate the hardship caused by the benefit cuts. In

---

15. "Legislative history of subsequent legislation is entitled to significant weight in construing earlier, related legislation." *Kalaris v. Donovan*, 225 U.S.App.D.C. 134, 150 n. 65, 697 F.2d 376, 392 n. 65 (citations omitted), *cert. denied*, 462 U.S. 1119, 103 S.Ct. 3088, 77 L.Ed.2d 1349 (1983).

16. In our view, both the trial court's and appellees' attempts to distinguish the *Long* and *Woods* cases are tenuous at best.

*Long,* the California Court of Appeals struck down the new welfare levels as violating the Food Stamp Act. *Long, supra,* 144 Cal.Rptr. at 70–71. In *Woods,* the United States Court of Appeals for the Ninth Circuit held that the U.S. Secretary of Agriculture was entitled to damages due to San Francisco's impermissible attempt under 7 U.S.C. § 2017(b) to shift its welfare burden to the federal government. *Woods, supra,* 724 F.2d at 1448.

In light of the plain meaning of "because of," the legislative history of 7 U.S.C. § 2017, and the case law interpreting it, we conclude that appellees acted improperly when they took food stamps into account in reducing AFDC benefits pursuant to the 1991 Act. Accordingly, we hold that the trial court's ruling that the fiscal crisis rather than the anticipated food stamp increase was the "principal factor" motivating the Council's decision to reduce AFDC benefits begged the question and, thus, was incorrect as a matter of law.

## B. Adequacy of Notice

■ Next, appellants argue that the District violated D.C.Code § 3–205.55(c),[17] 45 C.F.R. § 205.10(a)(4)(iii) (1992),[18] and the Due Process Clause of the Constitution by failing to give the statutorily-required notice to the AFDC recipients affected by the benefit cuts under the 1991 Act. The trial court ruled, in essence, that while the District "certainly could have provided a more detailed explanation" of the intended action, the notice was "adequate" with regard to appellants' right to personalized computations and their right to a hearing, and did not constitute a constitutional violation. *Quattlebaum, supra,* 120 Daily Wash.L.Rptr. at 1931.

During oral argument before this court, appellants' counsel argued that the inadequacy of the District's notice was two-fold: (1) it failed to notify the AFDC recipients in any

meaningful way of what their new level of benefits would be; and (2) it failed to apprise the recipients of their right to take an appeal in the event of computational errors. Appellants' counsel elaborated with regard to notice of the new benefit levels that, at a minimum, the recipient class should have been notified that there would be a 4.5 percent across-the-board reduction in benefits due to the adoption of the 1991 Act. Appellants' counsel also stated that even precise calculations should not have presented an undue administrative burden, because they would have had to have been developed anyway just weeks later when the benefit reductions went into effect. With regard to notice of the recipients' right to a hearing on computational errors, appellants' counsel maintained that, at a minimum, the notice should have said: "You may appeal if you feel there has been a computational error made in your benefits level. And, if you appeal, the reduction will not go into effect until after the hearing."

Appellees acknowledged in their brief that, as a result of the 1991 Act, the federal regulations and the applicable D.C.Code provisions mandated that they provide notice of the AFDC recipients' right to seek a hearing to challenge computational errors as well as a statement of the nature of the intended cuts. Although appellees presented arguments supporting the trial court's ruling both in their brief and orally before this court, their counsel conceded during oral argument that they were "not seriously challenging" the deficiency of the notice given. Appellees' counsel maintained, however, that even if the appellants are correct, and the notice had some deficiency, there is simply no basis in the record to give the substantive relief sought in this case. Appellants argued in reply, however, and we concur, that since the trial court granted summary judgment in

---

17. D.C.Code § 3–205.55(c) states:

> When changes in District of Columbia law require automatic grant adjustments for classes of recipients, timely notice of these grant adjustments shall be given, which shall be deemed "adequate" if it includes a statement of the intended action, the reasons for the intended action, a statement of the specific change in law requiring the action, and a statement of the circumstances under which a hearing may be obtained and assistance continued.

18. 45 C.F.R. § 205.10(a)(4)(iii) states:

> When changes in either State or Federal law require automatic grant adjustments for classes of recipients, timely notice of such grant adjustments shall be given which shall be "adequate" if it includes a statement of the intended action, the reasons for such intended action, a statement of the specific change in law requiring such action and a statement of the circumstances under which a hearing may be obtained and assistance continued.

favor of appellees, and, thus, the appropriate remedy was not addressed in the trial court, it would be inappropriate for this court to address, in the first instance, the issue of the proper remedy.

In light of appellees' concessions regarding the notice required and the notice given, we need proceed no further to reach the conclusion that the trial court's ruling as to the notice deficiency issue was incorrect. ·

### IV.

For the foregoing reasons, we reverse the trial court's order denying appellants' motion for summary judgment and granting appellees' motion for summary judgment and remand the case to the trial court for further proceedings in accordance with this opinion.[19]

*So ordered.*

**19.** We leave to the sound discretion of the trial court to fashion an appropriate remedy in this case after a "delicate balancing of the equities." *Archer v. District of Columbia Dep't of Human Resources,* 375 A.2d 523, 528 (D.C.1977). *See generally Carey v. Piphus,* 435 U.S. 247, 263, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978); *Sprint Communications Co. v. Kelly,* 642 A.2d 106, 118 (D.C.1994), *petition for cert. filed,* 62 U.S.L.W. 3863 (U.S. June 13, 1994) (No. 93–1987); *District of Columbia v. Gray,* 452 A.2d 962, 965

(D.C.1982). Because the issue of an appropriate remedy was not addressed in the trial court and is, thus, not before this court on appeal, *see Jones v. Howard University,* 574 A.2d 1343, 1346 (D.C. 1990), we express no opinion on what an appropriate remedy should be.

