Carrie QUATTLEBAUM,
et al., Appellants,

v.

Marion BARRY,* et al., Appellees.

No. 92–CV–504.

District of Columbia Court of Appeals.

Argued En Banc April 25, 1995.
Decided Dec. 21, 1995.

---

* Mayor Marion Barry is hereby substituted as a party for former Mayor Sharon Pratt Kelly. *See*  D.C.App.R. 43(c); *cf.* Super.Ct.Civ.R. 25(d).

Anthony Herman, Washington, DC, with whom Joshua D. Sarnoff, Tucson, AZ, Eric Lasker, and Florence Wagman Roisman, Washington, DC, were on the brief, for appellants.

Edward Schwab, Assistant Corporation Counsel, with whom John Payton, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellees.

Kathryn W. Lovill, Walter A. Smith, Jr. and A. Lee Bentley, III, Washington, DC, filed a brief on behalf of the Children's Defense Fund, as amicus curiae.

Before WAGNER, Chief Judge, and FERREN, TERRY, STEADMAN, SCHWELB, FARRELL, and KING, Associate Judges.

## ON REHEARING EN BANC

PER CURIAM: **

In 1991, the Council of the District of Columbia, confronted with a serious revenue shortfall, enacted legislation, subsequently signed by the Mayor, which reduced the benefit entitlements of AFDC recipients[1] to October 1, 1989 levels and eliminated the annual COLA[2] which recipients had previously received. *See* Budget Conformity Amendment Act of 1991, D.C. Law 9–27 (August 17, 1991). Appellants, AFDC recipients who were adversely affected by these benefit reductions, brought a class action in the Superior Court against the Mayor and other District officials (collectively the District), seeking injunctive and other relief. Appellants contended that the Council had unlawfully reduced their benefits, in violation of 7 U.S.C. § 2017(b) (1988), by improperly taking into consideration AFDC recipients' entitlement to receive food stamps. They also claimed that the Council had failed to reassess the current minimum needs of AFDC recipients, in violation of D.C.Code § 3–205.44.[3] Finally, appellants asserted that the individual notices advising AFDC recipients of the reductions were not in compliance with statutory and constitutional requirements.

Parties filed cross-motions for summary judgment and, on April 13, 1993, the trial judge issued a comprehensive opinion in which he granted the District's motion. *Quattlebaum v. Dixon,* 120 Daily Wash. L.Rptr. 1925 (Super.Ct.D.C.1992) (*Quattlebaum I* ). The AFDC recipients appealed and, on October 20, 1994, in *Quattlebaum II, supra* note 1, a division of this court reversed the judgment, holding that the Council had improperly considered the AFDC recipients' entitlement to food stamps and that the notices to the recipients were insufficient.[4] On

---

** Part I of the opinion for the court was written by *Associate Judge* SCHWELB. Part II of the opinion was written by *Associate Judge* FARRELL.

1. AFDC stands for Aid to Families with Dependent Children. *See* 42 U.S.C. §§ 601 *et seq.* (1991); D.C.Code § 3–205.10 *et seq.* (1994). The operation of the AFDC program is described in the opinion of the division. *See Quattlebaum v. Kelly,* 648 A.2d 950, 951 & n. 4 (D.C.1994) (*Quattlebaum II* ).

2. COLA stands for Cost of Living Adjustment.

3. Except as otherwise specified, all references in this opinion to the District of Columbia Code are to the 1994 edition.

4. The division did not reach the question whether the Council was required in 1991 to reassess the AFDC recipients' minimum needs, but stated that according to the uncontroverted evidence submitted by appellants in support of their motion for summary judgment, the Council had failed make such a reassessment. *Quattlebaum II, supra,* 648 A.2d at 951–52 & n. 5.

March 27, 1995, this court, sitting en banc, vacated the division opinion and granted the District's petition for rehearing en banc. We now affirm the trial court's principal rulings and sustain the validity of the benefit reductions.[5]

## I.

## THE FOOD STAMP ACT CLAIM

*A. The Facts.*

The facts of record are largely undisputed. They are described in detail both in the trial judge's memorandum opinion, *Quattlebaum I*, 120 Daily Wash.L.Rptr. at 1928–31, and in the opinion of the division. *Quattlebaum II*, 648 A.2d at 952–54. We recite only those facts, and address only those issues, which we view as necessary to decide this appeal.

In March 1991, during a fiscal crisis which has not abated in the interim, former Mayor Sharon Pratt Kelly presented to the Council her budget proposal for Fiscal Years 1991 and 1992. She recommended that the Council suspend the previously automatic annual COLA for AFDC recipients, and that individual entitlements be rolled back by 4.5% to 1989 levels.

5. We reinstate, without substantive review, Part III of the division's decision, relating to the adequacy of the notice to the AFDC recipients. *Quattlebaum II, supra,* 648 A.2d at 957–58. The District stated in its petition for rehearing or rehearing en banc that it would not have sought en banc review of that portion of the division's decision standing alone. According to the division's opinion, counsel for the District indicated at oral argument before the division that the District was not "seriously challenging" the deficiency of the notices. *Id.* at 957. At argument before the full court, counsel for the District claimed that the division had "misunderstood" the District's position, but he was unable to provide any information in support of this contention. Under all of these circumstances, we elect not to review en banc the division's decision with respect to the sufficiency of the notices. Because we sustain the validity of the substantive reductions in benefits, however, any relief to an individual recipient must be based on a miscalculation of his or her benefits, and must be limited accordingly.

6. *See* REPORT OF THE COUNCIL OF THE DISTRICT OF COLUMBIA COMMITTEE ON HUMAN SERVICES ON BILL 9–159, PUBLIC ASSISTANCE ACT OF 1982 BUDGET CONFORM-

On April 25, 1991, the Council's Committee on Human Services issued a Report[6] recommending that the Mayor's budget proposals be adopted. The Committee reported that "funding simply does not exist to fund adequately each and every program which the District has provided for in the past."[7]

Under federal law, the value of food stamp allotments which state agencies are authorized to issue increases as an eligible recipient's income decreases. *See* 7 U.S.C. § 2017(a) (1991). Recognizing that the law operates in this manner, the Committee noted that the loss of AFDC benefits would be partially offset by an increase in the food stamp allotment for which some affected recipients would be eligible. Report, at 6. The Report contained the following table:

| Household | FY 90 | FY 91 | AFDC Decrease | Food Stamp Increase |
|---|---|---|---|---|
| 1 | $ 258 | $ 270 | $ 12 | $ 4 |
| 2 | 321 | 336 | 15 | 5 |
| 3 | 409 | 428 | 19 | 6 |
| 4 | 499 | 522 | 23 | 7 |

*Id.* The Report further described a meeting of the Committee at which

Councilmember [Wilhelmina] Rolark noted that these types of reductions were devastating, because they "hit the most vulnerable of our population, the poor." She further noted that she understood that we are

ITY AMENDMENT ACT OF 1991 (Apr. 25, 1991), D.C.Law 9–27 (hereinafter the Report).

7. In explaining the "Background and Need" for the legislation, the Committee stated:

On March 1, 1991, the Mayor of the District of Columbia submitted budget proposal[s] to the Council of the District of Columbia for the Fiscal Year 1992 and the Fiscal Year 1991 (revised). In light of severe budget and financial restraints brought on by the economic recession, these budget proposals contained reductions which reflect the fact that District revenues are not keeping pace with expenditures, and the need to curtail certain expenditures in order to avoid a budget deficit. Included among the proposals submitted by the Mayor was no salary increase for District employees, no cost-of-living increase for District employees, and a reduction in spending in various District funded programs, including a reduction in the General Public Assistance Program ("GPA"), the Aid to Families with Dependent Children Program ("AFDC"), and the Emergency Assistance Services Program ("EAS").

Report at 2.

in a budget crisis, and inquired as to whether this bill was one of those budget conformity pieces of legislation. Chairman [H.R.] Crawford responded in the affirmative. Mr. Crawford further indicated that this bill was requested by the Executive *and that some of the difference in the public assistance reductions would be offset in the allocation of [f]ood [s]tamps....* Mr. Crawford further reminded the Committee that he had to work within the funds that "were allocated to the human services budget, that we did not allow the workers of the District of Columbia a COLA, or pay an increase in the last 2 years." He noted that *everyone must participate in the terrible budgetary crisis we are facing in the District.* Councilmember Rolark indicated that she understood and commended the chairman for having worked hard to off-set the reductions.

*Id.* at 17 (emphasis added).

### B. The Trial Judge's Decision.

The provision of the Food Stamp Act on which appellants rely states that

[t]he value of the allotment provided any eligible household shall not be considered income or resources for any purpose under any Federal, State, or local laws, including ... welfare, and public assistance programs, and no participating State or political subdivision thereof shall decrease any assistance otherwise provided an individual or individuals *because of* the receipt of an allotment under this chapter.

7 U.S.C. § 2017(b) (1988) (emphasis added). Appellants claimed at trial, and now contend in this court, that the references to food stamp eligibility in the Committee's Report demonstrated that AFDC benefits were rolled back "because of" recipients' eligibility for food stamps, in violation of § 2017(b).

The trial judge rejected this contention. He wrote that a state may undoubtedly reduce AFDC benefit levels because of financial exigencies, and that the Food Stamp Act "does not prohibit the defendants from lowering their guaranteed income level in order to protect their solvency." *Quattlebaum I,* 120 Daily Wash.L.Rptr. at 1929 (quoting *Foster v. Center Township,* 527 F.Supp. 377, 379

(N.D.Ind.), *aff'd. mem.* 673 F.2d 1334 (7th Cir.1981)). He perceived it to be "clear from the record ... that the principal factor precipitating defendants' reduction of AFDC benefits and suspension of the [COLA's] was the District's fiscal crisis." *Id.* The judge noted that the Council attempted to alleviate this crisis by making "across the board" budget cuts and adjustments, and that the Act was originally passed as emergency legislation "in order to alleviate budget problems as quickly as possible." *Id.*

Turning to the legislative history on which the AFDC recipients largely based their case, the judge wrote as follows:

Plaintiffs insist that Chairman Crawford's remarks concerning food stamps at the Council meeting on April 25, 1991, combined with the table in the Committee report, demonstrate the requisite causation. This hardly suffices to support plaintiffs' conclusion. These references merely called attention to the fact that increased food stamp allotments would offset approximately one-third of the AFDC decrease. In times of budgetary constraints an elected legislative body can scarcely be expected to forego pointing out that disagreeable medicine is not quite so bad as may first appear. Plaintiffs' broad interpretation of the statutory expression "because of" would put a virtual gag on legislators faced with the unpopular task of reducing AFDC benefit levels. The legislative history demonstrates unequivocally that the "cause" of the reductions was the District's severe fiscal crisis, not the consideration of food stamp allotments. Consequently, the Court concludes that the reduction did not violate the second prohibition of 7 U.S.C. § 2017(b).

*Id.*

### C. Legal Discussion.

It appears to be undisputed that the question whether the District was entitled to summary judgment is one of law. Accordingly, we must review the trial judge's decision *de novo. See, e.g., Colbert v. Georgetown University,* 641 A.2d 469, 472 (D.C. 1994) (en banc).

In conducting our review, we view the record in the light most favorable to the non-moving party. *Id.* In the present case, however, all parties sought disposition of the case by summary judgment, and no claim was made by anyone, either in the Superior Court or on appeal, that there are genuine issues of material fact requiring development at trial. Moreover, the resolution of the Food Stamp Act issue turns upon the intent of the Council in enacting the challenged legislation. No party has suggested that a trial could shed further light upon that intent, and we agree with the parties that the issue before us is one of law.

It is important to recognize, at the outset, the nature of the claim which the AFDC recipients are asserting under the Food Stamp Act, and the kind of relief which they are seeking. Appellants have asked the court to order the elected branches of the government to spend more money on the AFDC program because, they claim, the Council made the decision to reduce benefits for a legally impermissible reason. Moreover, appellants predicate their request for a judicial finding that the Council acted with an improper legislative purpose or motive solely on the fact that the Committee, and Councilman Crawford individually, provided to the Council factual information relating to the operation of the Food Stamp Act.

■ Especially in times of budgetary crisis, there are many competing claims on the District's limited financial resources. The Council cannot accommodate them all. Hard and painful choices must be made. The constitutional responsibility to make such choices falls upon our elected officials. They, and not the courts, are obliged "to reconcile the demands of … needy citizens with the finite resources available to meet those demands." *Dandridge v. Williams,* 397 U.S. 471, 472, 90 S.Ct. 1153, 1155, 25 L.Ed.2d 491 (1970). We are not authorized "to second-guess [District] officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." *Id.* at 487, 90 S.Ct. at 1163. We should accede to a request for judicial intrusion upon what we regard as a core legislative function only if it is plain that

the Council's action contravenes the federal legislation upon which appellants rely.

■ It is also surely essential to the proper functioning of democratic institutions that elected representatives be accorded the fullest possible opportunity to engage in free, open, and robust debate. Indeed, the Speech and Debate Clause, and by analogy the common law rule which that Clause expounds, were designed to protect the right of legislators to speak freely on the issues that come before them. *See, e.g., Gravel v. United States,* 408 U.S. 606, 616, 92 S.Ct. 2614, 2622, 33 L.Ed.2d 583 (1972). The Food Stamp Act should not be interpreted to preclude all mention of food stamp entitlements during the course of a legislative session, for such a construction would chill the exercise by Councilmembers of their right to free expression, and would raise obvious constitutional problems which should be avoided if reasonably possible. *See, e.g., Malone v. Robinson,* 614 A.2d 33, 38 n. 8 (D.C.1993) (per curiam), and authorities there cited.

■ With these general principles in mind, we turn to the specific issue before us. The trial judge correctly noted that the statute on which appellants rely requires them to show—and they must show clearly, in our view—that the AFDC recipients' benefits were reduced "*because of* the receipt of a [food stamp] allotment." 7 U.S.C. § 2017(b) (emphasis added). But *according to* the Report of the Committee on Human Services, these reductions were designed to avoid a looming budget deficit. Absent compelling evidence to the contrary, we must take the Council at its word as to why the legislation was enacted. *See* 2A NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION, § 45.1, at 49 (1992).

Significantly, the reduction of AFDC benefits was not measured by the food stamp benefits which would become available, but rather by the rollback of a COLA which AFDC recipients had previously received. Unless we treat the Committee's explication of the reasons for the legislation as a subterfuge or charade—and we discern nothing in the record which would permit us to do so— we are bound to agree with the trial judge's

assessment of the record with respect to the Council's principal purpose. The AFDC cuts were accompanied by a variety of other cost-reduction measures which had no connection whatever with food stamps, including a proscription against salary increases and cost-of-living adjustments for District employees. The Council also enacted substantial spending reductions in various other District-funded programs. See note 7, *supra*.

We do not believe that the accurate references in the Committee's Report to the operation of the Food Stamp Act validate appellants' position. The Council would have been compelled to deal with severe budget restraints brought on by the recession even if there had been no partially offsetting increase in food stamp allotments. Neither the Committee nor Councilman Crawford suggested that benefits should be reduced *because* food stamps would be available. Indeed, during the very exchange between Chairman Crawford and Councilmember Rolark on which appellants rely, Mr. Crawford emphasized that the Council was being forced to make unpalatable cuts because of "the terrible budgetary crisis we are facing in the District," and Mrs. Rolark said she understood.[8] The facts about food stamps were mentioned to the Council in order to reflect accurately the consequences of the proposed legislation, and perhaps to show that there would be at least a modest partial palliative to the bitter pill which the Councilmembers' less affluent constituents would be forced to swallow.

"A spoonful of sugar," in the words of Mary Poppins, "helps the medicine go down." The trial judge explicitly recognized as much. *Quattlebaum I*, 120 Daily Wash.L.Rptr. at 1929. To expect politicians to announce grim realities about the dark clouds in the financial sky, but to seal their lips as to the very modest silver lining, would be both unrealistic and unreasonable. A ruling that the mere mention of the existence of the sweetener establishes unlawful intent and dooms the legislation would have the inevitable tendency to coerce members of the Council into silence on matters relevant to the issues of the day. Legislators who wish to do their duty, and to avoid spending money which the District does not have, would be compelled either to bite their tongues and say nothing or to speak the truth and invite judicial invalidation of their efforts.

The Council has the right, notwithstanding the Food Stamp Act, to reduce AFDC benefits in order to protect the District's solvency. *Foster, supra*, 527 F.Supp. at 379. If the Council had decided, without regard to any financial crisis, simply to use food stamps as a substitute for funds previously provided through AFDC, this would be a different case. This is what occurred in some other jurisdictions in which the reductions were properly invalidated. See pages 13–14, *infra*. Here, however, the budget crisis—a "terrible" one according to Chairman Crawford—required wide-ranging spending reductions which applied not only to AFDC recipients but to other citizens as well. Persons eligible for food stamps were not singled out. We do not believe that Congress intended, through the "because of" language in the Food Stamp Act, either to proscribe necessary budgetary measures or to prohibit accurate references to the operation of the Act. Further, Congress could hardly have intended a reading of the statute which would predictably stifle debate and inhibit members of the legislature from referring to financial realities, even if the discussion in question was about food stamps.

Appellants contend that the trial judge construed the words "because of" too narrowly. They rely on cases such as *Montana v. First Federal Savings & Loan Ass'n*, 869 F.2d 100 (2d Cir.1989), in which the court held that under the federal Age Discrimination in Employment Act, which proscribes discrimination "because of" age, the plaintiff need not prove that age was the "sole" reason for the defendant's unfavorable employment action. *Id.* at 105. This court has

---

8. Even if the remarks by Councilmembers Crawford and Rolark supported appellants' thesis—and we do not think they do—we have recently reiterated that comments by individual legislators, which represent the views only of those individuals, shed little, if any, light upon the intent with which a statute was enacted. *See Chase v. District of Columbia Alcoholic Beverage Control Bd.*, 669 A.2d 1264, 1267 (D.C.1995).

likewise recognized, in the context of statutory and constitutional provisions designed to assure equal opportunity, that there is "no acceptable place in the law for partial racial discrimination." *Tursio v. United States,* 634 A.2d 1205, 1213 n. 7 (D.C.1993) (quoting *Smith v. Sol D. Adler Realty Co.,* 436 F.2d 344, 350 (7th Cir.1970)). But such provisions are remedial and must be generously construed. *Simpson v. District of Columbia Office of Human Rights,* 597 A.2d 392, 398 (D.C.1991); *see also Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 212, 93 S.Ct. 364, 368, 34 L.Ed.2d 415 (1972). Cases like *Montana* and *Tursio* are faithful to that enlightened canon, but have no application to the present context. Here, the broad construction of "because of" for which appellants contend would effect a most unusual intrusion by the courts into a traditional legislative domain. It would also potentially chill the exercise by Councilmembers of their right and obligation to speak their minds freely when proposed legislation is submitted to them for debate. These considerations were not present in the decisions cited to us by appellants.

Appellants also rely on cases such as *Dupler v. City of Portland,* 421 F.Supp. 1314 (D.Me.1976), in which the court said:

> The legislative history of the [Food Stamp] Act makes [it] clear that the intent of Congress was not to provide a substitute for other forms of aid to low-income persons but to supplement that aid in order to improve their level of nutrition.... It is evident that if welfare assistance is reduced to *take into account* the value of food stamps received under the Act, the ultimate effect of the Act will be not to raise but merely to maintain pre-existing levels of nutrition and the purpose of the Act will be frustrated.

*Id.* at 1319 (emphasis added). Seizing on the italicized language, which has also been used in several other decisions,[9] appellants assert

that the Council took the availability of increased food stamp allotments "into account," and thus violated the Food Stamp Act.

In *Dupler,* however, the city of Portland effectively reduced general assistance benefits by the exact amount of the newly available food stamp allotment. Instead of receiving the $18 which she was previously paid for food expenses under Portland's general assistance program, Ms. Dupler was now to be provided only with one dollar, for with that single dollar she could apparently obtain $18 in federal food stamps. *Dupler,* 421 F.Supp. at 1318. Portland never claimed, as does the District, that the benefits were reduced for any reason other than the availability of food stamps. On the contrary, the city's welfare officials had determined that, in order to avoid duplicative payments, receipt of federal food stamps should be taken into account in calculating the weekly food expenses for recipients of general assistance. *Id.* at 1318–19. In contrast, the District simply reduced the benefits and suspended the cost-of-living adjustments to address a fiscal crisis. Although the Council made reference to the impact of legislation on food stamp payments, it did not use the availability of food stamps to calculate the reduction in AFDC benefits.

In these circumstances, the use of the phrase "take into account" in the *Dupler* opinion cannot be carried over to the entirely different situation in the present case without removing the language from its moorings. *See Khiem v. United States,* 612 A.2d 160, 164 (D.C.1992), *cert. denied,* 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993) (broad and general statements of law in judicial opinions must be read in the context of the facts before the court, and cannot be uncritically transposed to different factual circumstances).[10]

In *Smith v. Dep't. of Public Aid,* 67 Ill.2d 529, 10 Ill.Dec. 520, 367 N.E.2d 1286 (1977),

---

9. *E.g., Woods v. United States,* 724 F.2d 1444, 1447 (9th Cir.1984); *Long v. City and County of San Francisco,* 78 Cal.App.3d 61, 144 Cal.Rptr. 64, 68–70 (Cal.App.1978).; *cf. Gooderham v. Adult & Family Serv. Div.,* 64 Or.App. 104, 667 P.2d 551, 558 (1983).

10. The other Food Stamp Act cases on which appellants rely, *supra* note 9, are likewise distinguishable on the same or similar grounds. *See Woods,* 724 F.2d at 1447–48; *Long,* 144 Cal.Rptr. at 70 (AFDC benefits reduced by anticipated amount of food stamp allotment); *Gooderham,* 667 P.2d at 557–58.

the Supreme Court of Illinois found that there was no violation of the Food Stamp Act where the State, "unlike [in] the *Dupler* case, ma[de] no distinction in its granting of welfare between food stamp recipients and those who do not receive food stamps." *Id.* at 525, 367 N.E.2d at 1291. In the present case, as in *Smith,* the reduction in AFDC benefits was "across the board," and applied to those who did not receive food stamps as well as to those who did. We conclude that the Food Stamp Act was not violated.[11]

## II.

### THE PROCEDURAL CLAIM

Appellants also contend, and our dissenting colleague agrees, that the Council rolled back AFDC benefits to 1989 levels without determining the current minimum needs of recipients, in violation of D.C.Code § 3–205.44.[12] We reject the premise of this argument—that the Council altered benefits unaware of the current level of needs for assistance—and therefore find no statutory or other violation.

At the heart of this dispute is section 544 of the District of Columbia Public Assistance Act of 1982 (now codified as D.C.Code § 3–205.44), which became effective on April 6 of that year. It provides:

(a) The amount of public assistance which any person shall receive shall be determined by the Council.

(b) Such amount as referred to in subsection (a) of this section shall not be less than the full amount determined as necessary on the basis of the minimum needs of such person as established by the Council.

The parties are in agreement that, despite the "not ... less than the full amount" language of subsection (b), Congress has relieved the District annually of the duty to set actual payment levels at one hundred percent of the established minimum needs. *See, e.g.,* District of Columbia Appropriations Act of 1970, § 17, Pub.L. No. 91–155, 83 Stat. 433; District of Columbia Appropriations Act of 1990, § 107, Pub.L. No. 101–168, 103 Stat. 1267, 1275, 1276.[13] For example, in 1986 the standard of assistance for a family of three persons was $712 per month, but the actual payment level was $364, or a little over fifty percent.

In keeping with subsection (b), in 1982 the Council of the District of Columbia established new standards of minimum need (termed "standards of assistance"). In 1986, the Council redetermined these needs of as-

---

**11.** Inviting our attention to the federal Omnibus Budget Reconciliation Act (OBRA) of 1981, which provides that a state agency, in setting AFDC levels, "may take into consideration as income ... an amount not to exceed the value of the family's monthly allotment of food stamp coupons," *see* 42 U.S.C. § 602(a)(7)(C)(i) (Supp. 1995), the District argues that 42 U.S.C. § 2017(b) has been implicitly repealed, and that the Council now has the authority to consider food stamp income in setting AFDC benefit levels. The trial judge rejected this contention because the District had indicated in its plan that it would not consider food stamps as income, and he held that the 1981 OBRA had no application to that situation. *Quattlebaum I,* 120 Daily Wash.L.Rptr. at 1928–29. In light of our disposition of appellants' Food Stamp Act claims on other grounds, we do not reach this issue.

**12.** The trial judge accurately summarized the proposed legislation, subsequently adopted by the Council, as follows:

In 1991, facing a severe budget shortfall, the Mayor's budget proposal for the fourth quarter of Fiscal Year 1991 and for Fiscal Year 1992 included $66 million in across-the-board

spending cuts. That proposal also included an approximate $14 million increase in funding for the AFDC program to provide for an anticipated increase to 24,000 in the number of District families requesting AFDC assistance, compared to 18,000 in Fiscal Year 1990. At the same time, the Mayor's budget proposed to decrease individual benefits by 4.5% and to suspend the previously automatic annual cost-of-living adjustment until 1993. The cumulative effect of these proposals would be to "roll back" AFDC benefits to June 1989 levels.

**13.** The District argues that these annual appropriations acts have made § 3–205.44 a dead letter. Appellants respond that, while Congress has eliminated the requirement of full funding, it has not eliminated the separate, "procedural" requirement of an assessment of minimum needs before any redetermination of public assistance is made. In view of our disposition of the case, we need not decide this issue. We likewise need not address the District's two other contentions, namely, that § 3–205.44 did not impose a procedural duty on the Council, and that even if a procedural duty was imposed, it was implicitly repealed by Act 9–27.

sistance, *see* D.C.Code § 3–205.52(c) (1981 ed; 1988 repl.). At the same time, it required for the first time that "[o]n or before January 31st of each year, beginning with January 31, 1987, the Mayor shall calculate and submit to the Council a determination of the percentage increase, during the preceding calendar year, in the consumer price index for urban consumers for all items, as published by the United States Department of Labor ('Consumer Price Index') [CPI]." Thereafter, "[t]he level of public assistance payments for assistance units set forth in subsection (c) of this section shall be increased annually as of October 1st of each year, beginning with October 1, 1987, by an amount equal to the percentage increase, if any, in the consumer price increase [*sic*; index?] as determined by the Mayor." *Id.*, § 3–205.52(d).[14]

■ Appellants do not, nor could they at this late date, challenge the Council's redetermination of the standards of need or assistance in 1986. Since 1987, therefore, continuing until the 1991 enactment in controversy here, the standards of assistance have effectively—though indirectly—been updated annually through an increase in payment levels by reference to cost of living increases shown in the CPI. We say "indirectly" because, while the standards of assistance themselves have not changed, each year the percentage level at which the District pays benefits has increased automatically to reflect increases (if any) in the cost of living. The ratio has thus been maintained between the needs of recipients in real dollars and the District's willingness to fund those needs. It follows that at the time the Council acted in 1991 to roll back payment levels to the 1989 mark, it was aware of current minimum needs for assistance as reflected in the 1986 standards *supplemented each year thereafter* by annual cost of living increases in the level of payments. In other words, because the 1986 enactment built into the District's scheme an automatic incorporation of cost of living increases annually, the Council was

presumptively aware of current needs when it determined nonetheless to reduce benefits to 1989 levels.

■ Accordingly, appellants' contention cannot be that the Council was unaware of current minimum needs in 1991, but that the information which informed it of those needs—the cumulative tally of annual cost of living increases reflected in the payment levels—was too imprecise or unreliable. But D.C.Code § 3–205.44(b) does not specify the means by which the Council must apprise itself of current needs; on the contrary, it refers solely to the minimum needs of aid recipients "as established by the Council." Manifestly, the Council was not required to consult particular studies or obtain its own experts to assess cost of living increases in the District between 1986 and the present; the CPI provides an objective gauge of any such increase in minimum wants, one widely accepted as reliable.

Our dissenting colleague charges us with reading into the Council's 1991 action a disfavored "implied repeal." He does not say that (under our analysis) the Council repealed D.C.Code § 3–205.44(b) itself; he could not say so because, as explained above, that section does not dictate the method by which the Council must inform itself of current minimum needs. Instead, the dissent says we are relying on an implied repeal of § 3–205.44(b) "as previously *implemented* ad hoc through § 3–205.52(c)," a repeal of the Council's prior "*interpretation* ... given to §§ 3–205.44 and 3–205.52(c)." *Post* at 46, 47 (emphasis added). This is, to say the least, an unorthodox notion of implied repeal. Moreover, the "implement[ation]" the dissent speaks of—the Council's revision of the actual standards of assistance in 1986 and earlier—was done without benefit of the automatic cost of living adjustment the Council established in 1986 to account for increases in recipient needs in 1987 and each year thereafter. Thus the Council did not "repeal" anything when, in revising the level of payments downward in 1991, it did so aware

14. The District pointed out in the trial court that, as a result of these automatic cost of living increases, "[f]rom 1986 until 1990 the District improved its ranking in AFDC payments from 28th to 16th among all jurisdictions," and that by 1990 "the per capita expenditure in the District for AFDC benefit payments was the second highest in the country.".

of current minimum needs as reflected in the cumulative cost of living increases since 1986.

Finally, the Council's action was consistent with *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). In *Rosado*, the Supreme Court considered an amendment to the Social Security Act of 1935 which required states, by July 1, 1969, to adjust "the amounts used by the State to determine the needs of individuals [eligible for AFDC] ... to reflect fully changes in living costs since such amounts were established," and to "proportionately adjust[ ]" any "maximums that the State imposes on the amount of aid paid to families...." While the Court recognized that this provision did not require the states to pay benefits equal to the minimum needs thereby established, it discerned in the language an important purpose "to require States to face up realistically to the magnitude of the public assistance requirement and lay bare the extent to which their programs fall short of fulfilling actual need...." *Id.* at 412–13, 90 S.Ct. at 1218. D.C.Code § 3–205.44(b) similarly requires the District's elected officials to keep abreast of "changes in living costs" so that, while they need not fund minimum needs completely, they do not "obscure the *actual* standard of need" and are mindful of "the political consequence of [any] cutback" such as that imposed by the 1991 enactment. *Id.* at 413, 90 S.Ct. at 1218. The CPI adjustments in payment levels made since 1987 insure that, when the Council rolled back payments in 1991, it was aware of the current, actual needs of recipients. As indicated, while the standards of assistance themselves had not changed since 1986, the annual changes in the ratio of payment levels to the standards corresponded directly to increases in the cost of living. Therefore, nothing masked from the Council the current needs of recipients when it concluded, nonetheless, that these could not be funded beyond 1989 payment levels for at least the next two fiscal years. We accordingly reject appellants' argument that the 1991 roll-back transgressed a duty of the Council to inform itself of current minimum needs before modifying payment levels.

### III.

### CONCLUSION

For the foregoing reasons, the judgment is affirmed in part. The opinion of the division is reinstated as to the notice issue only, see note 5, *supra*, and the case is remanded to the trial court for further proceedings as to that issue, as specified by the division. *See Quattlebaum II*, 648 A.2d at 958 n. 19.

*So ordered.*

FERREN, Associate Judge, concurring in part and dissenting in part:

I join Part I of the majority opinion after reconsideration of our analysis at division. *See Quattlebaum v. Kelly*, 648 A.2d 950, 954–57 (D.C.1994), *vacated*, 656 A.2d 728 (D.C. 1995). I also join the part of the disposition in Part III that reinstates the division opinion on the notice issue and remands for further trial court consideration as specified by the division. *See id.*, 648 A.2d at 957–58 & n. 19. I respectfully dissent, however, from Part II of the majority opinion that treats the claimed procedural violation. As I see it, in 1991 the Council of the District of Columbia unlawfully reduced AFDC benefits by reinstating 1989 payment levels without first reassessing the recipients' "minimum needs," as D.C.Code § 3–205.44(b) (1994) required.

### I. PROCEDURAL REQUIREMENT OF D.C.CODE § 3–205.44(B)

*The Council's Required Assessment of "Minimum Needs" Before Reduction of AFDC Benefits*

Because the focus of en banc rehearing was the food stamp issue on which the division rested its decision, the court has not adequately considered the other argument that appellants have presented to demonstrate why the Council unlawfully reduced AFDC benefits in 1991: the failure to reassess recipients' "minimum needs" before doing so. I believe that appellants' argument here is compelling and thus mandates reversal on this alternative ground.

*Congressional Enactment of the District of Columbia Public Assistance Act of 1962*

In adopting the District of Columbia Public Assistance Act of 1962, Pub.L. 87–807, 76 Stat. 914, Congress provided in section 5:

(a) The amount of public assistance which any person shall receive shall be determined in accordance with regulations approved by the Commissioners.

(b) Such amount as referred to in subsection (a) of this section shall not be less than the *full amount* determined as necessary on the basis *of the minimum needs* of such person as established in accordance with such regulations.

(c) The provisions of subsection (b) of this section shall become effective upon enactment.

D.C.Code § 3–204 (1967) (emphasis added).[1] Under this regime the District of Columbia's so-called state plan for public assistance provided benefits until 1970 covering the "full amount" of the recipients' "minimum needs," *id.*, established with reference to relevant cost of living indices.[2]

*1967–69: Congressional Adoption of Social Security Act Amendments*

The "full amount" principle was not to last. See *supra* note 2. "In 1967, Congress amended the Social Security Act to require all states to update by July 1, 1969, the standards for assistance to recipients of Aid to Families with Dependent Children (AFDC) to reflect the cost of living then current. 42 U.S.C. § 602(a)(23) (1970). *See also* 45 C.F.R. § 233.20(a)(2)(ii) (1970)." *Junghans v. Department of Human Resources*, 289 A.2d 17, 20 (D.C.1972) (footnote and emphasis omitted).[3] This amendment provided that

by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted.

42 U.S.C. § 602(a)(23). The amendment reflected a political compromise. The Johnson Administration initially had proposed legislation that would require the states (1) to establish standards for determining need reflecting the cost of living as of January 1, 1967; (2) to implement a plan that—like the one in the District of Columbia—would meet "all the need[s]" so established; and (3) effective July 1, 1968, to provide for the annual updating of these standards by reference to "changes in living costs." *Rosado v. Wyman*, 397 U.S. 397, 410, 90 S.Ct. 1207, 1217, 25 L.Ed.2d 442 (1970). Both the House and the Senate balked, however, resulting in an amendment—§ 402(a)(23), see *supra* note 3—that required the states and the District of Columbia to update the minimum "needs of individuals" to reflect July 1, 1969 "living costs," but allowed the states and the District to establish "maximums" short of those

---

1. After governmental reorganization, the word "Commissioners" in subsection (a) was changed to "District of Columbia Council." *See* D.C.Code § 3–204(a) (1973).

2. *Compare* Reg. No. 69–59, § 1, proposed at 16 DCR 187 (Dec. 1 1969), approved in Order No. 69–689 (Dec. 31, 1969), D.C.Code and DCRR Updater, p. 11 (June 1979) (authorizing "full allowance for basic requirements for the number of persons in the assistance unit as specified in the Standard for Requirements," with specified exceptions) *with* Reg. No. 70–36, § 1, 17 DCR 49 (Aug. 1, 1970) (providing Director of Department of Human Resources shall determine "basic requirements of individuals and families receiving public assistance based upon the February, 1970 cost of living" and "shall compute public assistance grants at a percentage of the cost of living of February, 1970, commensurate with available

funds") *and* Reg. No. 72–17, §§ 2 and 5(a), 19 DCR 211 (Oct. 1, 1972) (establishing standards of assistance for Public Assistance based on 1970 cost of living and providing for payments derived by subtracting "available resources ... (after applicable disregards)" and computing "75% of the remainder") *and* Reg. No. 74–42, §§ 1–3, 21 DCR 1524 (Jan. 1, 1975) (revoking Reg. No. 72–17, §§ 2 and 5(a); setting standards of assistance based on February 1973 Cost-of-Living Index; determining payment levels by subtracting "available resources ... (after applicable disregard)" and computing "85% of the February 1973 costs"; and authorizing "payment up to 100% of needs based on availability of funds").

3. The amendment reflected in 42 U.S.C. § 602(a)(23) was enacted as § 402(a)(23) of the Social Security Act of 1935, as amended, 81 Stat. 898.

needs (provided any previously established maximums were "proportionately adjusted" to reflect increased living costs as of July 1, 1969).

### 1969–70: Congressional Waiver of the District's "Full Amount" Requirement

Consistent with this legislation Congress, in its 1970 appropriations act for the District of Columbia, Pub.L. 91–155, 83 Stat. 433 (Dec. 24, 1969)—and in every appropriations act thereafter—waived the provision of D.C.Code § 3–204(b) (quoted above) that required the District to pay AFDC benefits in the "full amount . . . of the minimum needs."[4] Instead, Congress appropriated funds to pay welfare benefits at 85% of minimum needs. See H.Rep. No. 91–680, 91st Cong., 1st Sess. 17 (1969). Furthermore, presumably in response to the congressional waiver, beginning in 1970 the District's Commissioners adopted regulations authorizing public assistance payment levels to fall below

the "full amount[s]" required by D.C.Code § 3–204 (1967). See *supra* notes 2 and 4.

### 1970: Rosado v. Wyman

In the meantime, a class of welfare recipients in New York had filed suit—*Rosado v. Wyman*—challenging AFDC cutbacks as violations of the Social Security Act amendments, in particular § 402(a)(23), see *supra* note 3, that required updating of standards of assistance and payment levels by July 1, 1969. The Supreme Court eventually held that New York had "impermissibly lowered its standard of need by eliminating items that were included prior to the enactment of § 402(a)(23)." *Rosado*, 397 U.S. at 416, 90 S.Ct. at 1219. But in arriving at that result, the Court had to construe a provision it did not consider clear.

The background of § 402(a)(23) reveals little except that we have before us a child born of the silent union of legislative compromise. Thus, Congress, as it frequently does, has voiced its wishes in muted strains and left it to the courts to discern

---

4. Section 17 of the 1970 Appropriations Act, Pub.L. 91–155, 83 Stat. 433 (Dec. 24, 1969), provided in relevant part:

> Appropriations in this Act should be available for the payment of public assistance without reference to the requirement of subsection (b) of section 5 of the District of Columbia Public Assistance Act of 1962 [§ 3–204(b)].

The same or similar provisions were included every year thereafter in the following appropriations acts:

1971—Pub.L. 91–337, § 15, 84 Stat. 437 (July 16, 1970).
1972—Pub.L. 92–202, § 14, 85 Stat. 687 (Dec. 18, 1971).
1973—Pub.L. 92–344, § 12, 86 Stat. 455 (July 10, 1972).
1974—Pub.L. 93–91, § 11, 87 Stat. 310 (Aug. 14, 1973).
1975—Pub.L. 93–405, § 8, 88 Stat. 827 (Aug. 31, 1974).
1976—Pub.L. 94–333, § 8, 90 Stat. 791 (June 30, 1976).
1977—Pub.L. 94–446, § 109, 90 Stat. 1494 (Oct. 1, 1976).
1978—Pub.L. 95–288, § 208, 92 Stat. 281, 287 (June 5, 1978).
1979—Pub.L. 95–373, § 208, 92 Stat. 699, 704 (Sept. 18, 1978).
1980—Pub.L. 96–93, § 208, 93 Stat. 713, 717 (Oct. 30, 1979).
1981—Pub.L. 96–530, § 108, 94 Stat. 3121, 3126 (Dec. 15, 1980).

1982—Pub.L. 97–91, § 108, 95 Stat. 1173, 1180 (Dec. 4, 1981).
1983—Pub.L. 97–378, § 108, 96 Stat. 1925, 1932 (Dec. 22, 1982).
1984—Pub.L. 98–125, § 108, 97 Stat. 819, 826 (Oct. 13, 1983).
1985—Pub.L. 98–473, 98 Stat. 1837 (Oct. 12, 1984) incorporating H.R. 5899, 98th Cong., 2d Sess. § 107 (1984).
1986—H.R. 3067, 99th Cong., 2d Sess. (1985).
1987—Pub.L. 99–500, § 107, 100 Stat. 1783, 1783–189 (Oct. 18, 1986); Pub.L. 99–591, § 107, 100 Stat. 3341, 3341–189 (Oct. 30, 1986).
1988—Pub.L. 100–202, § 107, 101 Stat. 1329, 1329–98 (Dec. 22, 1987).
1989—Pub.L. 100–462, § 107, 102 Stat. 2269, 2269–8 (Oct. 1, 1988).
1990—Pub.L. 101–168, § 107, 103 Stat. 1267, 1275–76 (Nov. 21, 1989).
1991—Pub.L. 101–518, § 107, 104 Stat. 2224, 2234 (Nov. 5, 1990).
1992—Pub.L. 102–111, § 107, 105 Stat. 559, 567 (Oct. 1, 1991).

As indicated above in note 2, these congressional appropriations acts freed the local government to establish payment levels as percentages of the standards of assistance, rather than as the "full amount[s]" of those standards required by D.C.Code § 3–204(b) (1967). Thus, beginning in 1970, District regulations were facially inconsistent with the D.C.Code.

the theme in the cacophony of political understanding. Our chief resources in this undertaking are the words of the statute and those common-sense assumptions that must be made in determining direction without a compass.

*Rosado,* 397 U.S. at 412, 90 S.Ct. at 1218. The Court then concluded that, in order to enact welfare benefits consistent with § 402(a)(23), the states (and the District) first had to establish the recipients' minimum needs. A second, separate exercise was required to determine appropriate payment levels in light of those needs. More specifically, according to the Court:

> Reverting to the language of § 402(a)(23) we find two separate mandates: first, the States must re-evaluate the component factors that compose their need equation; and, second, any "maximums" must be adjusted.
>
> We think two broad purposes may be ascribed to § 402(a)(23): *First, to require States to face up realistically to the magnitude of the public assistance requirement and lay bare the extent to which their programs fall short of fulfilling actual need; second, to prod the States to apportion their payments on a more equitable basis. Consistent with this interpretation of § 402(a)(23), a State may, after recomputing its standard of need, pare down payments to accommodate budgetary realities by reducing the percent of benefits paid or switching to a percent reduction system, but it may not obscure the* actual *standard of need.*

> \* \* \* \* \* \*

In § 402(a)(23) Congress has spoken in favor of increases in AFDC payments. While Congress rejected the mandatory adjustment provision in the administration bill, it embodied in legislation the cost-of-living exercise which has both practical and political consequences.

It has the effect of requiring the State to recognize and accept the responsibility for those additional individuals whose income falls short of the standard of need as computed in light of economic realities and to place them among those eligible for the care and training provisions. *Secondly,*

*while it leaves the States free to effect downward adjustments in the level of benefits paid, it accomplishes within that framework the goal, however modest, of forcing a State to accept the political consequence of such a cutback and bringing to light the true extent to which actual assistance falls short of the minimum acceptable.* Lastly, by imposing on those States that desire to maintain "maximums" the requirement of an appropriate adjustment, Congress has introduced an incentive to abandon a flat "maximum" system, thereby encouraging those States desirous of containing their welfare budget to shift to a percentage system that will more equitably apportion those funds in fact allocated for welfare and also more accurately reflect the real measure of public assistance being given.

*Id.* at 412–14, 90 S.Ct. at 1218–19 (emphasis added).

In holding that New York had "impermissibly lowered its standard of need," *id.* at 416, 90 S.Ct. at 1219, the Court stressed the importance of the state's separate analysis of minimum needs as the predicate for setting payment levels.

> Section 402(a)(23) invalidates any state program that substantially alters the content of the standard of need in such a way that it is less than it was prior to the enactment of § 402(a)(23), unless a State can demonstrate that the items formerly included no longer constituted part of the reality of existence for the majority of welfare recipients.

*Id.* at 419, 90 S.Ct. at 1221.

In sum, *Rosado* confirmed that (1) a state's standards reflecting the minimum "needs of individuals" for public assistance must be separately "adjusted to reflect fully" the cost of living as of July 1, 1969, and that (2) a state's previously existing "maximum[ ]" payment levels that fall short of meeting those minimums must be "proportionally adjusted" upward as a second step. 42 U.S.C. § 602(a)(23). This particular legislation and the *Rosado* Court's ruling were limited to July 1, 1969 minimum needs and payment levels, but the two-step procedure was de-

scribed as inherent in the benefit-setting process. The Supreme Court therefore made clear that establishment of minimum needs and creation of payment levels are always separate exercises. Of equal significance, *Rosado* confirmed the lower courts' responsibility to enforce the law against any state that violates Social Security Act requirements governing the AFDC program.

*1982 and 1991: District Council's Enactment and Reaffirmation of the Public Assistance Act of 1982, Particularly D.C.Code § 3–205.44*

As I have noted, as early as 1962 the District of Columbia Code, unlike the law of New York adjudicated in *Rosado,* has provided for AFDC benefit levels that fully match the minimum needs established by the Council, even as those needs increase beyond the July 1, 1969 levels established as the minimum "needs of individuals" pursuant to the Social Security Act, 42 U.S.C. § 602(a)(23). Indeed, the congressionally enacted D.C.Code § 3–204 quoted at the outset of this opinion—adopted as part of the District of Columbia Public Assistance Act of 1962, Pub.L. 87–807, 76 Stat. 914—remained on the books until 1982, when the Council of the District of Columbia reenacted it virtually verbatim in the Public Assistance Act of 1982, D.C.Law 4–101, § 544, 29 DCR 1060 (April 6, 1982). Presently, it is codified as D.C.Code § 3–205.44 (1994):

(a) The amount of public assistance which any person shall receive shall be determined by the Council.

(b) Such amount as referred to in subsection (a) of this section shall not be less than the full amount determined as necessary on the basis of the minimum needs of such person as established by the Council.

More recently, in § 505a of the Public Assistance Act of 1982 Budget Conformity Amendment Act of 1991 ("1991 Act")—the Act at issue in this case—the Council expressly reaffirmed § 3–205.44 by incorporating it into a new program of General Assis-

tance for Children. *See* D.C.Code § 3–205.5a(c) (1994).

Interestingly, in this 1982 Act the Council incorporated standards of assistance, coupled with lower payment levels, just as the local regulations had earlier. *See* Public Assistance Act of 1982, D.C.Law 4–108, § 3, 29 DCR 1413 (May 19, 1982), presently codified at D.C.Code § 3–205.52 (1994); *supra* notes 2 and 4.[5] Accordingly, the D.C.Code began to incorporate ostensibly inconsistent provisions: one calling for payments in the "full amount" of "minimum needs" (§ 3–205.44), the other permitting "payment levels" lower than the minimums indicated by the prescribed "standards of assistance" (§ 3–205.52).

*Issue Presented: How to Reconcile D.C.Code § 3–205.44 With Annual Congressional Appropriations Acts Purporting to Waive It, and With D.C.Code § 3–205.52 Prescribing Payment Levels Lower than the Standards of Assistance*

Despite the continuity between Congress's enactment of § 3–204 and the Council's adoption of its successor, § 3–205.44—both having the "full amount" requirement—we have seen that for every fiscal year beginning with 1970, Congress has placed language in its appropriations acts for the District providing that appropriations shall be available for the payment of public assistance without reference to the "requirement" of § 3–205.44(b). See *supra* note 4. Other provisions of local regulations and the D.C.Code have reflected this relaxation of the "full amount" principle in § 3–205.44(b). The question, then, is how § 3–205.44(b) fits with appropriations acts that purport to waive it and with D.C.Code provisions that are inconsistent with it. More precisely, does § 3–205.44—despite the District's appropriations acts and Code provisions that limit its application—retain vitality which should have affected the Council's 1991 legislation that effectively reduced AFDC benefits to 1989 levels without reassessing minimum needs?

**5.** The Council, in fact, had adopted statutory payment levels lower than the prescribed standards of assistance at least as early as 1979. *See*

Public Assistance Payments Act of 1979, D.C.Law 3–3, § 2, 25 DCR 9639, 10876 (June 7, 1979).

*The Parties' Contentions*

Appellants contend, the trial court agrees, and none of my colleagues disputes that § 3–205.44(b) incorporates two obligations the Council imposed on itself in adopting the District of Columbia Public Assistance Act of 1982: to assess "the minimum needs" of persons eligible for public assistance, and to set benefit payment levels at the "full amount" of those needs. The first has been called a "procedural" requirement, the second a "substantive" requirement. These requirements reflect the two components—the two legislative exercises—the Supreme Court in *Rosado* identified in § 402(a)(23) of the Social Security Act, codified at 42 U.S.C. § 602(a)(23). This court itself, in fact, has said as much. In 1972, while the Council and the Mayor–Commissioner were administering the AFDC statute adopted by Congress, we noted in dictum the separateness of setting minimum needs and the ensuing payment levels:

> The substantive legal issue [not reached] ... serve[s] to point up how important are the decisions by the Council and the Commissioner 1 to fix a welfare payment formula and 2 to establish a public assistance standard of need. When called upon to review their actions, we are mindful, too, that the Supreme Court has ascribed to the Congress an intention to require each state, including the District, "to face up realistically to the magnitude of the public assistance requirement and lay bare the extent to which their programs fall short of fulfilling actual need," and to "paying the political consequences of such disclosure."

*Junghans,* 289 A.2d at 22 (quoting *Rosado,* 397 U.S. at 412–13, 90 S.Ct. at 1218).

Appellants acknowledge that, through the District's appropriations acts, Congress annually has waived the Council's substantive obligation under § 3–205.44(b) to pay AFDC benefits in the "full amount" required by the recipients' "minimum needs." But appellants argue that elimination of this substantive obligation does not affect the procedural requirement and, indeed, makes that procedure—that reassessment of "minimum needs"—all the more significant for an obvious reason: if benefit "payment levels" are to fall below "minimum needs," then it is especially important to assess exactly what those minimum needs are so that the Council members clearly understand, and face up to, just how far *below* those needs they are willing to permit AFDC payments to fall. *See Rosado,* 397 U.S. at 413, 90 S.Ct. at 1218; *Junghans,* 289 A.2d at 22.

The District replies that, because each annual appropriations act permits AFDC payments "without reference to the *requirement* of § 3–205.44" (emphasis added), see *supra* note 4, this use of the singular negates any two-requirement interpretation, and thus eliminates any sound basis for identifying a separate "procedural" requirement in § 3–205.44(b).

*Three Reasons Why D.C.Code § 3–205.44 Mandates Reassessment of "Minimum Needs" Before the Council Can Lawfully Reduce AFDC Payment Levels Under D.C.Code § 3–205.52*

Contrary to the District's contention, I agree with appellants and the trial court that § 3–205.44(b) includes a procedural requirement that is wholly separate from the substantive requirement, and that the annual congressional appropriations act waives the latter without affecting the former. In the first place, D.C.Code §§ 3–205.44 and 205.52 are District of Columbia statutory provisions that implement § 402(a)(23) of the Social Security Act, 42 U.S.C. § 602(a)(23). The first calls for determination of "minimum needs" and for payments of "not ... less than the full amount" so determined; the second actually establishes those minimum needs, called "standards of assistance," as well as "payment levels" reflecting a percentage of those standards. Accordingly, these provisions reflect the "two separate mandates," *Rosado,* 397 U.S. at 412, 90 S.Ct. at 1218; *see Junghans,* 289 A.2d at 22, required for establishment of AFDC benefits. As to the second mandate, however, the payment level, § 3–205.44(b) ("full amount") and § 3–205.52(c) (percentage approach) are inconsistent with each other—the latter apparently being in-

tended to reflect the ongoing appropriations act waiver. See *supra* note 4.[6]

As we recognized in *Junghans,* no one can seriously dispute that, after *Rosado,* D.C.Code § 3–205.44 mandates the two requirements which the parties to this litigation have called procedural (establishing "minimum needs") and substantive (setting "payment levels"), respectively. This two-requirement analysis can be illustrated by the fact that the Council, in 1982, enacted § 3–205.44 (in effect reenacting the previous D.C.Code § 3–204) despite full awareness that Congress routinely waived that "requirement" in the annual appropriations act, see *supra* note 4, and that local regulations reflected the waiver. The Council, in fact, expressly incorporated § 3–205.44 by reference, once again, in provisions of the 1991 Act establishing a new program of General Assistance for Children. These 1982 and 1991 actions may mean, in part, that the Council wished to keep the "full amount" norm of § 3–205.44 in place, despite the failure to implement it since at least 1970. But it has to mean more. For there to be any real purpose in keeping § 3–205.44(b) on the books, in light of its substantive inconsistency with congressional waivers and with § 3–205.52(c) payment schedules, one can only infer that the Council has continued to rely on § 3–205.44(b) to preserve the procedural requirement—the first *Rosado* obligation—to reassess "minimum needs" before payment levels are adjusted.

In *Rosado* the Supreme Court stressed that "the courts should construe all legislative enactments to give them some meaning." *Id.,* 397 U.S. at 415, 90 S.Ct. at 1219. Keeping that admonition in mind, I conclude that, in view of 25 years of congressional waiver of § 3–205.44(b) in the annual appropriations act, the Council's 1982 enactment and 1991 reaffirmation of § 3–205.44 have to mean

something *more* than adoption and confirmation of a meaningless norm that is inconsistent with other statutory provisions enacted by Congress and the Council itself. This is especially true because the Council has continued to recognize the validity of § 3–205.44 by actually assessing minimum needs from time to time as *Rosado* requires (more later) while at the same time regularly (1) adopting lower statutory payment levels and (2) initiating the financial waiver of § 3–205.44 through the annual budget request acts submitted to Congress.[7]

There is a second reason why the procedural requirement of § 3–202.44 survives. In addition to the Council's own affirmation of a two-step *Rosado* obligation under § 3–205.44, the annual congressional waiver of § 3–205.44 itself has always been limited to payment levels; nothing in that legislation purports to compromise the Council's adoption of the § 3–205.44 procedural ("minimum need") requirement. According to the trial court—and I agree—

> [t]he legislative history of the District of Columbia Appropriations Act of 1969 (the first to suspend part of what is now § 3–205.44) demonstrates that Congress intended only to permit the District to pay less than the full amount of the standard of assistance. *See* H.Rep. No. 91–680, 91st Cong., 1st Sess. 17 (1969) ("[l]anguage has been included in the bill ... to permit paying less than 100 percent as required by ... [the D.C.Code]. Limited revenue in the District has influenced the modified position of paying only 85 percent."). The language of the 1969 Act is identical to the language of The District of Columbia Appropriations Act of 1990 which provides that appropriations "shall be available ... without reference to ... [D.C.Code § 3–

---

6. D.C.Code § 3–205.52(c) sets forth a table prescribing the "standards of assistance" and corresponding "payment levels" for families of different sizes, from one to 19 persons. D.C.Code § 3–205.44(b) requires that payment levels "shall not be less than the full amount ... of the minimum needs." All parties agree that the "minimum needs" referred to in § 3–205.44(b) are the "standards of assistance" established in § 3–205.52(c).

7. *See, e.g.,* Fiscal Year 1981 Budget Request Act, D.C.Act 3–294, § 108, 27 DCR 5315, 5329 (Dec. 5, 1980) ("Appropriations in this Act shall be available for the payment of public assistance without reference to the requirement of section 5(b) of the District of Columbia Public Assistance Act of 1962"); Fiscal Year 1983 Budget Request Act 4–162, § 108, 29 DCR 1283, 1301 (March 1, 1982) (same); Fiscal Year 1991 Budget Request Act, D.C.Act 8–188, § 107, 37 DCR 2589, 2599 (April 13, 1990) (same).

205.44]." *There is nothing in the legislative history of the 1990 act which indicates that congress intended to go further and this time to repeal the procedural requirement of D.C.Code § 3–205.44.*

Quattlebaum v. Dixon, 120 D.W.L.R. 1925, 1930 (Sept. 9, 1992) (emphasis added).

Finally, in the past the District has routinely honored the two requirements of § 3–205.44 and thereby demonstrated its own understanding of the law: that a minimum needs assessment must precede a change in benefit levels. In 1979 and in 1982, for example, the Council established a "100% Scale Standard of Assistan[ce]" based on the February 1977 Cost of Living Index and the February 1981 Consumer Price Index, respectively, and then created a lesser "Current Payment Level" as to each. *See* Public Assistance Payments Act of 1979, D.C.Law 3–3, § 2, 25 DCR 9639, 10876 (June 7, 1979); Part IV.A., District of Columbia AFDC State Plan § 2, TN # 79–4 (July 1, 1979); Public Assistance Act of 1982, D.C.Law 4–108, § 3, 29 DCR 1413 (May 19, 1982), codified at D.C.Code § 3–205.52 (1984 Supp.); Part IV. A., District of Columbia AFDC State Plan, § 2, TN # 82–1 (Feb. 1, 1982). Again in 1984 the Council raised the standards of assistance by reference to the February 1983 cost of living index, with corresponding increases in payment levels that remained below the standards of assistance (minimum needs). *See* Public Assistance Payments Increase Act of 1984, D.C.Law 5–100, § 2, 31 DCR 2896 (Aug. 10, 1984), codified at D.C.Code § 3–205.52(c) (1985 Supp.). Finally, in 1986, the last time payment levels were adjusted, the Council separately reassessed minimum needs "based on the February 1985 cost of living index." Public Assistance Amendments Act of 1986, D.C.Law 6–124, § 2(c), 33 DCR 2940, 2942 (June 25, 1986), codified at D.C.Code § 3–205.52(c) (1987 Supp.); *see id* § 3–205.52 (1994 Supp.). The Council's own practice, therefore, illustrates and validates the survival of the procedural ("minimum needs") requirement despite the appropriations process. There obviously is no inconsistency between an appropriations act waiving the "full amount" requirement of § 3–205.44 and the Council's continuing to honor *Rosado's* procedural (assessment of

"minimum needs") requirement before approving a lesser amount—as the 1986 actions by Congress and Council respectively demonstrate.

The District's argument that § 3–205.44 contains only one, substantive requirement, as evidenced by the appropriations acts' routine references to that "requirement" in the singular, see *supra* note 4, is unpersuasive. Although purporting to be a "plain language" argument, it ignores the fact that a "requirement" can contain more than one element. But even more to the point, the appropriations act language dates back to 1969, see *supra* note 4, before *Rosado* made clear—and legally essential—that AFDC determinations involve two separate kinds of calculations. The fact that the boilerplate waiver language has remained the same after *Rosado*, therefore, indicates only that the *Rosado* issue never arose in the District of Columbia until the present case has revealed that the § 3–205.44 "requirement" is a big one, with two components.

In sum, (1) the Council enacted § 3–205.44 in 1982 and expressly reaffirmed that provision as recently as the 1991 Act itself, despite years of annual appropriations act waivers by Congress and of local statutory reductions of payment levels below the "full amount" required to meet "minimum needs"; (2) the legislative history indicates that the annual appropriations act waiver applies only to payment levels; and (3) the Council has routinely followed the practice of reassessing minimum needs as it did, for example, in 1979, 1982, 1984, and 1986. These developments combine to convince me that the so-called procedural requirement of § 3–205.44(b), derived from *Rosado*, has survived the congressional appropriations and local legislative processes.

II. COUNCIL'S FAILURE TO COMPLY WITH § 3–205.44(B) PROCEDURAL REQUIREMENT IN 1991

*The En Banc Majority's Position and Summary of Its Defects*

In its haste to deal with a fiscal crisis in 1991, the Council simply ignored a legal requirement that Congress, and then the Coun-

cil itself, had enacted to assure that minimum needs are calculated—and carefully considered—before a reduction of AFDC payment levels. No one disputes that the Council failed to assess minimum needs expressly before passage of the 1991 Act. The trial court itself noted that, "during the roughly 36 hours of hearings, meeting[s], and budget debates on the Act, only 25 minutes of those events touched on AFDC benefits." *Quattlebaum v. Kelly*, 170 Daily Wash.L.Rptr. 1925, 1930 (1992). None of that time was spent on minimum needs.

The en banc majority—employing an analysis neither raised in the trial court nor argued on appeal—opines that the Council in fact can be said to have reassessed minimum needs in 1991 because, as far back as 1986, the Council had added an annual cost of living increase in "payment levels" to the same legislative package in which the Council had expressly reassessed minimum needs ("standards of assistance"). According to the majority, therefore, over the ensuing years "[t]he ratio has thus been maintained between the needs of recipients in real dollars and the District's willingness to fund those needs." *Ante* at 17–18. I gather this means the majority believes that in 1991, before reducing AFDC payment levels, the Council realized, and thus implicitly decided, that minimum needs had in fact increased at the same CPI rate that payment levels had increased since 1986, even though the detailed "standards of assistance" (minimum needs) in § 3–205.52(c), as formally revised in 1986, had remained unchanged in the statute itself.

There are four problems with the majority position: *First*, in 1986, when expressly increasing minimum needs and AFDC payment levels in § 3–205.52(c) over those established in 1984—and then legislating automatic annual increases in payment levels by amending § 3–205.52(d) to incorporate the Consumer Price Index (CPI)—the Council did not address recalculation of minimum needs in the future. The Council in 1986, therefore, cannot be said to have repealed its traditional ad hoc approach to reassessment of minimum needs under §§ 3–205.44 and 3–205.52(c), reflecting *Rosado's* procedural requirement. *Second*, in 1991, in

amending § 3–205.52(d) to reduce AFDC payment levels to those used in 1989 (as well as to suspend future CPI increases in payment levels until 1993), the Council neither expressly nor impliedly amended the procedural requirement of § 3–205.44 and the related "standards of assistance" (minimum needs) in § 3–205.52(c). *Third*, increases in minimum needs, as defined in the § 3–205.52(c) "standards of assistance," are not necessarily reflected in automatic CPI increases in AFDC payment levels; the Council's employment of the CPI to calculate annual payment increases does not inherently reflect annual increases in statutory minimum needs. *Finally*, the majority's automatic cost-of-living increase approach to minimum needs does not, in any event, satisfy the Supreme Court's ruling in *Rosado*.

*Statutory History of D.C.Code § 3–205.52(c) and (d) from 1984*

In order to make clear why the foregoing analysis—not the majority's—is correct, I believe it is important to lay out the statutory history in some detail.

In 1984, the Council increased AFDC "standards of assistance" (minimum needs) and corresponding AFDC "payment levels" as follows:

(c) The standards of assistance, based on the February, 1983 cost-of-living index, are set forth in the following table and include basic costs of food, clothing, shelter, household and personal items, certain transportation costs, and life insurance when paid by the Mayor.

STANDARDS OF ASSISTANCE

| Family Size | Standards of Assistance | Payment Levels |
|---|---|---|
| 1 | $412.00 | $206.00 |
| * | * | * |
| * | * | * |
| * | * | * |
| 19 | $2,556.00 | $1,278.00 |

(d) The table set forth in this section shall be used for all payments and eligibility determinations made after September 30, 1984.

Public Assistance Payments Increase Act of 1984, D.C.Law 5–100, § 2, 31 DCR 2896

(Aug. 10, 1984), codified at D.C.Code § 3–205.52(c) and (d) (1985 Supp.).

The law remained unchanged in 1985. *See* D.C.Code § 3–205.52(c) and (d) (1986 Supp.).

In February 1986, the Mayor signed the Council's temporary legislation again increasing minimum needs and payment levels:

(e) The standards of assistance, based on the February 1985 cost of living index, are set forth in the following table and include basic costs of food, clothing, shelter, household and personal items, certain transportation costs, and life insurance when paid by the Mayor.

### STANDARDS OF ASSISTANCE

| Family Size | Standards of Assistance | Payment Levels |
|---|---|---|
| 1 | $ 450.00 | $ 220.00 |
| * | * | * |
| * | * | * |
| * | * | * |
| 19 | $2,786.00 | $1,367.00 |

(f) The table set forth in subsection (e) of this section shall be used for all payments and eligibility determinations made after March 31, 1986.

Public Assistance Payments Increase Temporary Act of 1986, D.C.Law 6–106, § 2(e) and (f), 33 DCR 1165 (Feb. 14, 1986); *see* D.C.Code § 3–205.52 (1987 Supp.) (annotation: "temporary amendment of section").

Soon thereafter the Council considered proposed amendments to the temporary legislation that increased the scheduled payment levels even further and provided thereafter for annual increases in payment levels determined by reference to the percentage increase, if any, in the U.S. Department of Labor "consumer price index for urban consumers for all items" (hereafter "all items" CPI).[8] *See* Bill 6–280, "Automatic Cost of Living Increase for Public Assistance Grants Act of 1985," referred to in Committee Report on Bill 6–379, Public Assistance Amendments Act of 1986 (Feb. 27, 1986). These amendments were adopted as part of the Council's permanent legislation, subsections (c) and (d), which renumbered and amended the temporary legislation, D.C.Law 6–106, § 2(e) and (f), as follows (in relevant part):

(c) The standards of assistance, based on the February 1985 cost of living index, are set forth in the following table and include basic costs of food, clothing, shelter, household and personal items, certain transportation costs, and life insurance when paid by the Mayor.

### STANDARDS OF ASSISTANCE

| Family Size | Standards of Assistance | Payment Levels |
|---|---|---|
| 1 | $ 450.00 | $ 229.00 |
| * | * | * |
| * | * | * |
| * | * | * |
| 19 | $2,786.00 | $1,422.00 |

(d) The table set forth in subsection (c) of this section shall be used for the fiscal year beginning October 1, 1986. On or before January 31st of each year, beginning January 31, 1987, the Mayor shall calculate and submit to the Council a de-

---

**8.** According to the BUREAU OF LABOR STATISTICS, U.S. DEP'T OF LABOR, BULLETIN No. 24414, Handbook of Methods 176 (1992):

The Consumer Price Index (CPI) is a measure of the average change in the prices paid by urban consumers for a fixed market basket of goods and services. The Bureau of Labor Statistics (BLS) calculates the CPI monthly and publishes it about two weeks after the end of the month to which it refers.

BLS calculates the CPI for two population groups, one consisting only of wage earners and clerical workers and the other consisting of all urban consumers. The Consumer Price Index for Urban Wage Earners and Clerical Workers (CPI–W) is a continuation of the historical index that was introduced well over a half-century ago for use in wage negotiations. As new uses were developed for the CPI in recent years, the need for a broader and more representative index became apparent. The Consumer Price Index for All Urban Consumers (CPI–U) introduced in 1978 is representative of the buying habits of about 80 percent of the noninstitutional population of the United States, compared with 32 percent represented in the CPI–W. The methodology for producing the index is the same for both populations and is described in detail in part II of this chapter.

The Bureau of Labor Statistics compiles CPI indices showing annual percentage changes by category (*e.g.*, food, shelter, medical care) over the base years 1982–84. The BLS also creates a CPI for "all items" or categories for urban consumers taken together. *See* THE WORLD ALMANAC 102–03 (Robert Famighetti ed., 1994). This is the "all items" compilation referred to in D.C.Code § 3–205.52(d).

termination of the percentage increase, during the preceding calendar year, *in the consumer price index for urban consumers for all items,* as published by the United States Department of Labor ("Consumer Price Index"). *The level of public assistance payments for assistance units set forth in subsection (c) of this section shall be increased annually* as of October 1st of each year, beginning with October 1, 1987, by an amount equal to the percentage increase, if any, in the consumer price increase as determined by the Mayor. The Mayor shall publish notice of this *annual increase in public assistance payments* in the D.C. Register within 30 days of the increase. The *increase in public assistance payments* provided by this subsection shall be in addition to any other *increase in public assistance payments* otherwise provided by law. . . .

Public Assistance Amendments Act of 1986, D.C.Law 6–124, § 2(c) and (d), 33 DCR 2940, 2943 (June 25, 1986), codified at D.C.Code § 3–205.52(c) and (d) (1987 Supp.) (emphasis added).

The statute remained the same until 1991, although AFDC payment levels increased each year in accord with the "all items" CPI. *See id.* In 1991, however, the Council enacted emergency and temporary legislation to roll back AFDC payments to 1989 levels and to suspend consumer price indexing until October 1, 1993. *See* Omnibus Budget Support Emergency Act of 1991, D.C.Act 9–37, 38 DCR 3390, 3392–93 (May 17, 1991); Omnibus Budget Support Temporary Act of 1991, D.C.Law 9–19, 38 DCR 4066, 4068–69 (June 21, 1991). This legislation did mention "standards of assistance" (minimum needs); it expressly retained, without change, the standards of minimum need in effect since 1984. *See* D.C.Law 9–19, 38 DCR at 4069; D.C.Act 9–37, 38 DCR at 3393. The Council then reenacted these provisions as permanent legislation two months later, as follows (in relevant part):

(c) The standards of assistance are set forth in the following table and include basic costs of food, clothing, shelter, household and personal items, and certain transportation costs, and life insurance when paid by the Mayor.

### STANDARDS OF ASSISTANCE

| Family Size | Standards of Assistance | Payment Levels |
|---|---|---|
| 1 | $ 450.00 | $ 258.00 |
| * | * | * |
| * | * | * |
| * | * | * |
| 19 | $2,786.00 | $2,599.00 |

(d) The table set forth in subsection (c) of this section shall apply to payments made beginning July 1, 1991. On or before January 31st of each year, beginning with January 31, 1993, the Mayor shall calculate and submit to the Council a determination of the percentage increase, during the preceding calendar year, in the consumer price index for urban consumers for all items, as published by the United States Department of Labor ("Consumer Price Index"). *The level of public assistance payments for assistance units set forth in subsection (c) of this section shall be increased annually* as of October 1st of each year, beginning with October 1, 1993, by an amount equal to the percentage increase, if any, in the consumer price increase as determined by the Mayor. The Mayor shall publish notice of this *annual increase in public assistance payments* in the D.C. Register within 30 days of the increase. The *increase in public assistance payments* provided by this subsection shall be in addition to any other *increase in public assistance payments* otherwise provided by law. . . .

Public Assistance Act of 1982 Budget Conformity Amendment Act of 1991 ("1991 Act"), D.C.Law 9–27, § 2(g), 38 DCR 4205, 4207–08 (Aug. 17, 1991), codified at D.C.Code § 3–205.52(c) and (d) (1992 Supp.) (emphasis added). The 1991 Act, like the emergency and temporary legislation that immediately preceded it, also established a new program of General Assistance for Children that expressly incorporated § 3–205.44, thereby preserving the procedural requirement derived from *Rosado*. *See* D.C.Law 9–27, § 2(d), 38 DCR at 4205–06; D.C.Code § 3–205.5a (1992 Supp.).

*1986: Council's Reassessment of Minimum Needs and Enactment of Annual increases in AFDC Payments By Reference to "All Items" CPI*

From this brief statutory history, it is clear that in 1986 the Council reassessed and increased minimum needs ("standards of assistance"), as it had in 1984, before finalizing payment levels. The Council then enacted an "all items" CPI provision in a separate subsection to provide—expressly—for an automatic "annual increase in public assistance payments" without providing expressly for an automatic recalculation of minimum needs. D.C.Code § 3–205.52(d) (1987 Supp.). More specifically, (1) the very 1986 process of addressing minimum needs first, followed by (2) an amendment (to the temporary legislation) providing for CPI increases in future AFDC payments alone, without reference to minimum needs, while (3) retaining the scheduled minimum needs in the permanent legislation, taken together reflect a legislative mindset that kept minimum needs assessment and payment level calculations altogether separate. This approach made sense in that annual *increases* in payment levels did not require regular reassessments of minimum needs, for it was obvious from § 3–205.52(c) that payments lagged far behind needs, and thus that increased payments were inherently salutary from a recipient's viewpoint. A *reduction* of payment levels, however, given *Rosado* and § 205.44, was an altogether different story not before the Council in 1986.

In sum, in 1986 the Council enacted annual increases in AFDC payment levels for the future, based on the "all items" CPI, wholly apart from its earlier, ad hoc reassessment of minimum needs and payment levels that year. There is no indication that the Council intended its 1986 addition of an annual cost-of-living increase in AFDC payments to provide a future substitute for needs reassessments, which had always been a wholly different, ad hoc procedure that remained unchanged in the statutory language itself in 1986 and thereafter. *Compare* D.C.Code § 3–205.52(c) (1987 Supp.) *with id.* § 3–205.52(c) (1992 Supp.). The majority provides no basis from statutory language or legislative history to dispute this analysis as of 1986.

*1991: En Banc Majority's Erroneous Ruling that Council Impliedly Amended Procedure for Reassessing Minimum Needs*

The en banc majority nonetheless rejects the notion that the Council's ad hoc procedure for reassessing minimum needs—employed consistently in 1979, 1982, 1984, and 1986—is the only way the Council can lawfully reassess minimum needs before reducing AFDC payment levels. My colleagues conclude that automatic annual application of the "all items" CPI to AFDC payment levels is also an objectively reliable—or at least a reliable enough—indicator of increasing minimum needs. From this view of what *could* be lawfully enacted, the majority takes an unwarranted step in concluding that in 1991 an automatic needs reassessment *was* enacted simply because the Council, *presumably* by calculating a string of CPI increases between 1986 and 1991, *must* be said to have informed itself about welfare recipients' minimum needs when it reduced 1991 payment levels to those used in 1989. See *ante* at 18. I reject this argument. There is no evidence the Council relied on such CPI calculations for that purpose in 1991. Without saying so, therefore, the majority invokes—I believe improperly—the doctrine of implied repeal.

In particular, by concluding that the Council in 1991 "indirectly" (the majority's word) reassessed minimum needs through automatic application of the "all items" CPI, the majority essentially holds that, by relying on § 3–205.52(d) to ascertain minimum needs, the Council impliedly repealed the procedural requirement of § 3–205.44, as previously implemented ad hoc through § 3–205.52(c), and thus has substituted a less exacting requirement. That purported substitute fails because it does not satisfy the criteria for implied repeal.

In analyzing the majority's approach it is important, first, to reemphasize that in 1991 the Council itself unquestionably kept the "procedural requirement" of § 3–205.44 alive by expressly incorporating § 3–205.44 into the new General Assistance for Children provisions of the 1991 Act, despite the appropri-

ations act waiver of the "full amount" requirement of § 3–205.44. There can be no implied repeal of a provision the Council explicitly embraces. *See Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 468, 102 S.Ct. 1883, 1890, 72 L.Ed.2d 262 (1982) ("intention of the legislature to repeal must be clear and manifest").[9] The question, then, is whether there is any basis for inferring that, in reducing AFDC payments levels in 1991 to those used in 1989, the Council can be said, before doing so, to have repealed its approach in 1986 (and earlier) under §§ 3–205.44 and 3–205.52(c) for reassessing minimum needs. I believe not.

No one contends the Council in 1991 *expressly* repealed the ad hoc procedural requirement of § 3–205.44, based on *Rosado* and implemented, as needed, by amendment of § 3–205.52(c). See *supra* note 9. For the Council to have amended this procedural requirement, therefore, it had to take two steps: (1) construe the 1986 language of § 3–205.52(d) that provides for an "annual increase in public assistance payments," derived from the CPI, to mean, more broadly, an "annual increase in public assistance *standards of assistance [minimum needs] and related* payments" (new language italicized); and (2) intend this added, implied language to repeal the interpretation therefore given to §§ 3–205.44 and 3–205.52(c), derived from *Rosado.* That exercise could work only if justified as a valid, implied repeal and amendment. That, I suggest, did not happen.

"[R]epeals by implication are not favored, and whenever possible statutes should be read consistently." *Speyer v. Barry*, 588 A.2d 1147, 1164 (D.C.1991) (quoting *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 523–24, 106 S.Ct. 768, 771–72, 88 L.Ed.2d 877 (1986)). Such repeals are recognized only if

the statutes (or provisions) at issue are inherently irreconcilable, such that one must be said to trump the other. *See Speyer*, 588 A.2d at 1165. ("One who claims that a later statute has repealed an earlier one by implication must show that the two acts 'are irreconcilable, clearly repugnant as to vital matters to which they relate, and so inconsistent that the two cannot have concurrent operation.' ") (citation omitted).[10] There is no irreconcilable conflict between § 3–205.44, as interpreted by reference to *Rosado* and § 3–205.52(c), and the CPI amendment to § 3–205.52(d). The latter provision can be implemented, according to its terms (referring only to annual increases in "payments") without affecting the *Rosado* procedure for reassessing "minimum needs" traditionally used under § 3–205.44.

We have seen that, after reassessing minimum needs in 1986, the Council enacted a separate bill amending § 3–205.52(d) to increase "payments" each year by reference to the "all items" CPI. At that time the Council manifested no intention to repeal its usual way—the *Rosado* way—of reassessing minimum needs under §§ 3–205.44 and 3–205.52(c), as it had just accomplished for the 1986 legislation on public assistance. Thus, in reducing AFDC payment levels in 1991, the Council faced no hurdle that required its abandonment of a traditional needs assessment in favor of a new approach based on CPI calculations.

Applying the principles we have expressed in *Speyer*, this court should conclude that adoption of the CPI amendment affecting annual AFDC payment levels did not impliedly repeal the ad hoc procedural requirement of §§ 3–205.44 and 3–205.52(c), as interpreted by reference to *Rosado.* Rather than repealing and amending the law, the Council violated the law.[11]

---

9. The District contends that the procedural requirement of § 3–205.44 is entirely inconsistent with—and thus implicitly repealed by—the 1991 reduction of AFDC payments to 1989 levels. The majority, I believe correctly, has not accepted that argument. See *ante* at n. 13.

10. *See also Committee for Nuclear Responsibility, Inc. v. Seaborg*, 149 U.S.App.D.C. 380, 382, 463 F.2d 783, 785 (1971) (per curiam) (by enacting authorization and appropriations legislation for

underground test of nuclear warhead, Congress did not impliedly repeal National Environmental Policy Act requirement subjecting underground test to environmental impact statement).

11. The majority opines that the Council in 1991 reinterpreted the § 3–205.44 procedural requirement by reference to the "all items" CPI, but concludes that this reinterpretation cannot be an implied repeal because that would be an "unorthodox notion." Why unorthodox? Because,

*Annual Application of "All Items" CPI Does Not Necessarily Reflect Annual Increases In Minimum Needs*

There is another reason why the majority's analysis falls short. The cost-of-living mechanism at issue here does not provide the information the majority assumes it does. Pursuant to D.C.Code § 3–205.52(d) (1987 Supp.), AFDC payment levels have increased annually since 1986 (until 1991) by reference to the "all items CPI." *See supra* note 8. Contrary to the majority view, these CPI increments do not necessarily reflect annual increases in minimum needs (statutory "standards of assistance"), and therefore do not necessarily satisfy the § 3–205.44(b) procedural requirement mandating reassessment of minimum needs before reduction of AFDC payment levels.

Over the years, standards of assistance (minimum needs) have been calculated with reference to the "basic costs of food, clothing, shelter, household, and personal items, certain transportation costs, and life insurance." D.C.Code § 3–205.52(c) (1994); *id.* § 3–205.52(c) (1984 Supp.). Sometimes this provision of the statute has referred to a particular February "cost of living index." *See, e.g.,* D.C.Code § 3–205.52(c) (1987 Supp.) ("February 1985"); *id,* § 3–205.52(c) (1984 Supp.) ("February, 1977"). Later, the reference to "cost of living index" was removed. *See, e.g.,* D.C.Code § 3–205.52(c) (1992 Supp.). In any event, even if we assume that a "cost of living index" applies and that the one designated for use in § 3–205.52(c) is the CPI for urban consumers referred to in § 3–205.52(d), there is no assurance that the particular items from the CPI list used to calculate statutory standards of assistance (minimum needs) are the same as those covered by the "all items" CPI. *See supra* note 8. The latter includes items such as "new cars" and "entertainment," which are not referred to in § 3–205.52(c), and the former includes "insurance," which is not reflected in the CPI. *See* THE WORLD ALMANAC at 102–03 (Robert Famighetti ed., 1994); *supra* note 8. These distinctions are important because the individual components of the "all items" CPI and of the statutory standards of assistance, respectively, will have different increases and decreases that result, in the aggregate, in different percentage changes in the two categories over time. These differences, perhaps, may not be great, but the conceptual distinction leads to three conclusions:

(1) Annual use of the "all items" CPI to increase payment levels under § 3–205.52(d) may be useful in helping AFDC recipients keep up with inflation (to the extent they are subsidized), but that particular CPI does not reflect the mix of items traditionally used to calculate minimum needs. Accordingly, the Council's use of the "all items" CPI to calculate payment levels does not automatically reflect a calculation of minimum needs based on the "fewer-than-all items" of the CPI that comprise the § 3–205.52(c) "standards of assistance" (minimum needs).

(2) In calculating minimum needs, the Council presumably addresses at the outset the particular components of need specified in the statutory standards of assistance. *See*

says the majority, the characterization of the Council's 1991 action as a partial, implied repeal overlooks the Council's 1986 establishment of the annual cost-of-living adjustment "to account for increases in recipient needs in 1987 and each year thereafter." *Ante* at 19. It is interesting to note that the majority carefully avoids saying that the 1986 Council enacted a new mechanism for reassessing "minimum" needs. More to the point, there can be no doubt that, when a court says the legislature has reinterpreted a statute, without expressly amending it, to impose a requirement that materially differs from the statute's longstanding interpretation, the legislature will have effected—with judicial blessing—an implied repeal, since "*x*" no longer means "*x*," it means "*y*". Here, the majority imputes to the Council in 1991 an intention to reinterpret, and thus partially repeal by implied amendment, the

procedural requirement of § 3–205.44, even though there is not a shred of evidence the Council intended to do so. The evidence is, rather, that the Council in 1991 plainly forgot to undertake a separate reassessment of minimum needs that the Council has required of itself under a regularly followed procedure the Council has required of itself under a regularly followed procedure the Council had *never changed*. The majority does not deny that it *imputes* an intention to the Council that, in light of past practice, reflects a procedural change the Council itself has never acknowledged. Nor could the Council so acknowledge, since the new "all items" CPI language in § 3–205.52(d), added in 1986, expressly referred only to an "annual increase in public assistance payments," not additionally to the related but separate category, "standards of assistance" (minimum needs).

§ 3–205.52(c). But the Council is not limited to the statutory categories currently specified; the Council is free to amend those categories as costs or needs change. Furthermore, even if the Council were to retain the present standards of assistance categories, the Council may add or subtract items within established categories, e.g., within the "household and personal items" or within "certain transportation costs." Such changes could further distort reliance on the "all items" CPI for assessment of minimum needs.

(3) Recently, moreover, as indicated earlier, the Council has omitted reference to the cost of living index in describing the categories of standards of assistance. See, e.g., D.C.Code § 3–205.52(c) (1992 Supp.). This suggests the possibility that the Council may recognize the value of indices other than, or in addition to, the CPI when standards of assistance are calculated in the future.

In short, whether we focus on the statutory standards of assistance in § 3–205.52(c) as published, or on the need for adoption and application of amended standards that may be more appropriate for the future, the "all items" CPI number is not automatically applicable. Reassessment of minimum needs— the "standards of assistance" prescribed by statute—before AFDC benefit levels are reduced inherently involves ad hoc, not programmed, decision-making.

*Amended Procedure for Reassessing Minimum Needs by Reference to "All Items" CPI Violates* Rosado v. Wyman

Finally, even if an "all items" CPI has a place in a minimum needs calculation, and even if in 1991 the Council impliedly abandoned its traditional approach to minimum needs assessment, that repeal would not be in keeping with *Rosado*. The kind of minimum needs assessment reflected "indirectly"

(as the majority would have it) in annual application of the "all items" CPI to the statutory payment levels amounts, at best, to a kind of vague awareness of needs that does not come close to *Rosado's* mandate that Council members "face up realistically to the magnitude of the public assistance requirement and lay bare the extent to which their programs fall short of fulfilling actual need," *id*, 397 U.S. at 412–13, 90 S.Ct. at 1218—an exercise the Council has regularly conducted before 1991 when reassessing minimum needs (in 1979, 1982, 1984, and 1986).[12] I do not believe that the procedural requirement of § 3–205.44 can be satisfied "indirectly," *ante* at 17, by a less scrutinizing, casual reference to the "all items" CPI authorized years earlier as a substitute for the deliberative, ad hoc minimum needs analysis that *Rosado* has long been understood to require before AFDC payment levels can be reduced.

### III. CONCLUSION

The plaintiffs-appellants, a class of AFDC recipients, complain of a law violation—a short-circuiting of the legislative process— that has repudiated their statutory rights as residents eligible for public assistance. When that happens, as *Rosado* makes clear, the courts have a responsibility to declare the violation and order a remedy, not walk away. That is what courts are for. This court abdicates that responsibility today by manufacturing an argument for affirmance that no one has proffered to the court. It is an argument that, in my judgment, amounts to a clever, but fallacious, way to bail out the Council from its careless failure to comply with the law.

Respectfully, therefore, I must dissent.

---

12. The District's argument that the Council, in 1991, did engage in a minimum needs assessment by listing the standards of assistance and the corresponding payment levels in the 1991 Act is frivolous. The "standards of assistance" in the 1991 Act were established in 1986 based on the 1985 cost-of-living index. See Public Assistance Amendments Act of 1986, D.C.Law 6–124, § 2(c), 33 DCR 2940, 2942 (June 25, 1986), codified at D.C.Code § 3–205.52(e) (1987 Supp.). Nothing of record indicates that the Council reevaluated the validity of these standards for 1991. See D.C.Code § 3–205.52(c) (1994). The *Rosado* approach—mandated by the Social Security Act— has been firmly embedded in our law since 1970, and the Council has followed this procedure virtually as a matter of local due process in providing statutory AFDC entitlements. Simply to ignore this procedure would be to ignore the fact that the Council reaffirmed it by referencing § 3–205.44 in the 1991 Act itself in creating the new program of General Assistance for Children.